876 P.2d 1300

**Peter A. CROSBY, Plaintiff–Appellant,**

v.

**STATE of Hawai'i DEPARTMENT OF BUDGET & FINANCE; State of Hawai'i Department of Accounting & General Services; Yukio Takemoto, Director of State of Hawai'i Department of Budget & Finance; Russel Nagata, State Comptroller; Does 1–50, inclusive, Defendants–Appellees.**

No. 16064.

Supreme Court of Hawai'i.

July 18, 1994.

Thomas R. Grande (Stanley E. Levin, with him on the briefs, of Davis & Levin), Honolulu, for plaintiff-appellant.

Charles F. Fell, Deputy Atty. Gen., Honolulu, for defendants-appellees.

Before MOON, C.J., KLEIN, LEVINSON and NAKAYAMA, JJ., and JAMES S. BURNS, Intermediate Court of Appeals Chief Judge, assigned by reason of vacancy.

KLEIN, Justice.

Plaintiff–Appellant Peter A. Crosby, an employee of the State of Hawai'i Department of Budget and Finance (DBF), appeals from judgment in a jury-waived trial entered against him and in favor of Defendants–Appellees State of Hawai'i, DBF, State of Hawai'i Department of Accounting and General Services (DAGS), Yukio Takemoto, and Russel Nagata (collectively "the State"). We affirm.

## I. *Background*

In 1988, the State Legislature appropriated $250,000.00 for the fiscal year 1988–89 to be expended by the DBF for a comprehensive management study of the state's tourism program and the Hawai'i Visitor's Bureau ("the project"). Act 390, § 5(197), 1988 Haw. Sess. Laws 759, 829. In July 1988, Dennis Goda, Chief of the Budget, Planning and Management Division of DBF, assigned to Crosby, a DBF Resource Allocations Sys-

tems Analyst (RASA),[1] the task of preparing specifications to facilitate the hiring of a consultant to conduct the project. Goda was Crosby's immediate supervisor.

Crosby timely prepared the project specifications and presented them to Goda. Goda then directed Crosby to prepare a request for proposal (RFP) for the project. Crosby prepared a draft RFP and presented it to Goda on or about September 7, 1988. In addition, Crosby reviewed Hawai'i Revised Statutes (HRS) Chapter 103, Expenditure of Public Money and Public Contracts, and concluded that HRS § 103–22 (Supp.1992)[2] mandated selection of a consultant for the project through competitive bid. Accordingly, Crosby recommended this method of selection to Goda and prepared documents necessary for public advertisement of the project. Goda agreed with Crosby's recommendation and directed Crosby to finalize the RFP. Crosby later delivered the RFP to Goda who, in turn, sent it to Yukio Takemoto, the Director of the DBF. Because of the project's importance, Takemoto assigned the project to DBF Deputy Director Robert Takushi for supervision on September 20, 1988; that way, Takemoto could "keep an eye" on the project through Takushi. It was understood by all involved that the project was very important to Takemoto.

After reviewing the RFP, Takushi requested certain schedule revisions. Crosby made these revisions, and on November 1, 1988, forwarded the revised RFP to Goda with a memorandum enclosing documents for the advertisement of the project for competitive bid. On November 3, 1988, Goda sent the RFP and Crosby's memorandum to Takushi and recommended that Takushi approve the advertisement. Takushi considered the recommendations of both Crosby and Goda. Based on his own understanding of the law, however, Takushi decided that the selection procedure could be "non-bid" and directed Goda to send the RFP only to the largest accounting firms, i.e., the "big-eight" accounting firms.

On November 8, 1988, Goda informed Crosby of Takushi's decision and directed Crosby to select only the "big-eight" accounting firms for receipt of the RFP. Because he believed that a non-bid selection procedure for the project would violate HRS § 103–22, Crosby declined Goda's directive. Consequently, Goda selected the eight largest accounting firms from the "yellow pages" and requested that Crosby draft "letters of invitation" to each enclosing the RFP.

On November 10, 1988, Crosby prepared a memorandum to accompany his internal transmission of draft letters of invitation to the big-eight firms. The memorandum confirmed in writing Crosby's position that HRS § 103–22 required bids for the project be solicited through competitive means by advertising, and urged that the mandated selection procedure be reconsidered. Thereafter, Goda contacted DAGS seeking its opinion on the bid or non-bid issue. DAGS advised Goda that the project need not be advertised and could "go non-bid." Accordingly, via memorandum on November 12, 1988, Goda responded to Crosby's prior memo by stating:

> Although I agree with your reading of Section 103–22, H.R.S., it seems that the

---

1. Crosby, a twenty year DBF employee, was one of two program evaluators employed by DBF in July 1988.

2. HRS § 103–22 provides in relevant part:

 **Advertisement for bids required; exceptions.** *No expenditure of public money,* except salaries or pay of officers or employees, or permanent settlements, subsidies or other claims or objects for which a fixed sum must be paid by law, or for other purposes which do not admit of competition, or for the purchase of materials or supplies from any other department, bureau, organization, or municipal or political subdivision of the federal, state, municipal or county governments, other than University of Hawai['̵]i bookstores, or for the performance of public work or contracts by any other such department, bureau, organization, or municipal or political subdivision of the federal, state, municipal or county governments, *where the sum to be expended is $8,000 or more shall be made except under contract let after public advertisement for sealed tenders, in the manner provided by law....* No expenditures for public purposes shall be so divided or parceled as to defeat or evade this section. (Emphasis added.)

DAGS, the agency responsible for the interpretation of Section 103–22, suggests that much [sic] of these contracts (if not all) do not lend itself [sic] to competition; therefore, exempt [sic]. Further, although we have recommended that the contract be put out to bid, we have been instructed to limit notice to 'large accounting firms'.

Still firm in his conviction that § 103–22 compelled a competitive bid, Crosby telephoned Deputy Attorney General Patricia Ohara to voice his concerns. Although this discussion concerned the application of HRS § 103–22 in general terms only (without discussing the specifics of the project), Crosby was encouraged that the Department of the Attorney General might favor his position. Thus inspired, Crosby generated a November 16, 1988 memorandum to Goda exhorting the DBF to obtain an Attorney General's Opinion regarding the application of HRS § 103–22 to the project. Goda answered that the decision to "go non-bid" was final.

The RFPs were sent to the "big-eight" accounting firms. By the beginning of 1989, two national accounting firms had responded with proposals: Peat, Marwick, Main & Company ("Peat–Marwick") and Arthur Young & Company ("Arthur Young"). On January 10, 1989, Goda asked Crosby to evaluate the proposals and determine which was preferable. On February 3, 1989, Crosby informed Goda that, in his opinion, both proposals were inadequate. Further, Crosby expressed concern that both Peat–Marwick and Arthur Young had potential conflicts of interest: because each had previously performed consultant work for the Hawai'i Visitor's Bureau, they would be reviewing their own work.

Goda presented Crosby's conflict of interest concern to the State Auditor and the State Board of Accountancy. Each advised Goda that any conflict of interest could be addressed by either firm, and, therefore, disqualification was not warranted. On February 23, 1989, Goda relayed this information to Crosby with notification that Takemoto had selected Peat–Marwick to be consultant for the project. Accordingly, Crosby was asked by Goda to prepare an appropriate contract for his review. Crosby prepared the contract and submitted it to Goda on February 28, 1989, together with a memorandum memorializing his dissatisfaction concerning the adequacy of the proposals and restating his conflict of interest concern. Following standard procedure, Goda instructed Crosby to forward the contract to the Department of the Attorney General for a review as to form.

Deputy Attorney General Diane Erickson reviewed the contract and submitted written comments to Crosby on March 6, 1989. Among her comments, Erickson questioned why the contract did not contain a "sole source or non-competitive" clause. Crosby then arranged a meeting with Erickson on March 8, 1989 to discuss the contract. At the meeting, Crosby explained the project and discussed his position regarding the application of HRS § 103–22. Erickson agreed that Crosby had raised legitimate concerns but, because the issues fell within a "grey area," informed him that she wished to discuss the matter further with her supervisor. In the meantime, Crosby left the draft contract with Erickson.

Subsequently, on March 14, 1989, Erickson spoke with Crosby by telephone. She explained that there are two clearly recognized exceptions to the HRS § 103–22: the common law "sole source" doctrine and the statutory "does not admit of competition" clause.[3] The decision whether to apply these excep-

---

3. HRS Chapter 103 does not define what purposes "do not admit of competition" under HRS § 103–22. Contracts for such purposes are sometimes referred to interchangeably as "sole source" or "consultant" contracts. Sole source contracts may have as their subject the purchase of unique goods or the retention of highly technical professional services. In any event, a state official seeking to let a sole source contract must obtain "sole source approval" from DAGS. If DAGS denies approval, the department may request sole source approval directly from the Governor.

In 1977, the Director of DAGS (the State Comptroller) issued a memorandum ("Circular 1977–3") attempting to set out the types of con-

tions to the project was left to the discretion of the Director of the DBF.[4] Erickson said she would send a confirming note to Crosby on this subject.

On April 7, 1989, Erickson returned the draft contract to Crosby with a note stating:

> As you know, chapter 103, [HRS], requires most contracts to be awarded by competitive bidding. If the requirements of chapter 103 are not satisfied, you must be aware that the contract is subject to challenge. I trust that your office's records indicate the reasons why this contract is a sole source or consultant's contract.

Because sole source approval had not been obtained, and because he continued to believe that the "do[es] not admit of competition" statutory exception did not apply to the contract, Crosby assumed Erickson's note was a subtle suggestion that he falsify his files.[5] Therefore, Crosby once again met with Erickson on April 11, 1989 to discuss her note. At this meeting, Crosby told Erickson that the issue he raised about the propriety of a non-bid selection process had not been resolved. Erickson offered little more than that she was not aware of any written Attorney General's Opinion on point.

Crosby remained convinced that a "sole source" or "non-competitive" clause was improper and, therefore, his inclusion of this type of term in the contract might constitute participation in a law violation.[6] On April 12, 1989, Crosby forwarded the contract (without a sole source clause) to Goda, including Er-

ickson's April 7th note and his own memo pointing out that Erickson's comment appeared to raise the same concerns that he had. As the trial court noted, "[i]n essence, Crosby's April 12, 1989 memorandum to Goda raised in written form once again, Crosby's argument that the project should go bid." Findings of Fact (FOF) 60.

On April 14, 1989, Erickson met with Takushi to discuss various matters. Among them, Erickson mentioned Crosby's persistent concern regarding the procedure used in selecting a consultant for the project. Takushi asked Erickson if there was an exception to the public bid requirement that was applicable to the project. Erickson replied that there was such an exception, effectively reassuring Takushi that his prior understanding that the project could "go non-bid" was in fact legally correct.

Thereafter, Takushi met with Goda to air Crosby's concerns. Despite the fact that Crosby was not an attorney, had no expertise in this area, and had never before been involved in drafting this type of contract, he insisted that the project should be competitively bid even though his supervisors, DAGS and the Attorney General's Office felt otherwise. *See supra* note 4 (explaining the State's apparent rationale). Takushi testified that during the meeting with Goda he formed the impression that the project was "bogged down" and not moving forward; that Crosby was losing his objectivity; that he was not getting the job done and was in fact creating tension; and that antagonism

---

tracts that do not admit of competition and outline a procedure for requesting sole source approval from DAGS. Circular 1977–3 was distributed to the directors of all state departments.

4. The State explains that the nature and importance of the project required the exercise of professional judgment by the contractor; consequently, the State concluded that the project should not be awarded to the lowest responsible bidder, but to an experienced firm with proven judgment quality. *See* HRS § 103–32 (exempting "purposes which do not admit of competition" from the bid requirement). The State claims that it may contract with a selected firm on a "non-competitive" basis under the "consultant" exemption to HRS § 103–22, *see supra*

footnote 3, and, as such, the submissions from Peat Marwick and Arthur Young did not constitute competitive bids.

5. The trial court specifically found, however, that "Erickson, through her comments and transmittals, never meant that [Crosby] lie, conceal the truth, break the law, or manufacture documents." FOF 57.

6. HRS § 103–48 (1985) provides that any person who violates § 103–22 shall be fined not more than $1,000 and/or imprisoned more than one year. HRS § 85–32 (1985) requires all public employees to uphold the laws of the State.

and "bad blood" had developed between Goda and Crosby. Takushi thus concluded that the project would be administered more efficiently if Crosby was reassigned. Accordingly, Takushi directed Goda to remove Crosby from the project.

Crosby learned of his removal from the project a few days later when Al Chun, a DBF management analyst, informed Crosby that he would be replacing him on the project. Chun had been told he was taking over because Crosby was "too busy" on other projects. Chun completed the contract and included a clause indicating that the subject of the contract did not admit of competition. *See supra* notes 3, 4 and accompanying text (discussing "sole source" and "non-competitive" clauses). The DBF sent the final version of the contract to Peat–Marwick for signature on April 19, 1989.[7] Before the end of April 1989, however, Takushi contacted Peat–Marwick and explained that a complaint (apparently Crosby's civil complaint) had been or would be filed challenging the validity of the selection procedure employed for the project. As a result, Peat–Marwick deferred execution of the contract.[8]

 On July 14, 1989, Crosby filed a verified complaint alleging that his removal

from the project violated the Hawai'i Whistleblowers' Protection Act ("HWPA"), HRS §§ 378–61 to –69 (Supp.1992), and requesting that the court order his reinstatement to the project and enjoin any future retaliatory action. By August 1, 1990, Crosby had filed first and second amended complaints alleging that his removal also violated his free speech rights under the federal and state constitutions ("First Amendment Rights")[9] and that Circular 1977–3 was invalid because it was not promulgated in conformity with the Hawai'i Administrative Procedures Act ("HAPA"), HRS Chapter 91.

After a four-day trial, the trial court issued ninety-seven FOF and ten Conclusions of Law (COL) in support of an order favoring the State defendants. Accordingly, judgment was filed on March 18, 1992.[10]

On appeal, Crosby specifically challenges the trial court's COL 2, 3 and 7, which read as follows:

> 2. The State of Hawaii did not discriminate against Crosby regarding compensation, terms, conditions, location or privilege of employment as those terms are used in [HRS] Section 378–22 [sic, presumably HRS § 378–62].

---

7. At this time, sole source or consultant contract approval had neither been obtained nor requested. Takushi nevertheless testified that he intended to obtain these approvals.

8. Subsequently, in September *1989*, Goda directed Chun to evaluate a tourism project that recently had been conducted by the Legislative Auditor. Chun concluded that the Legislative Auditor's *study was very similar to the study* contemplated by the project. Consequently, Takemoto cancelled the project.

9. Crosby alleges violations of the first amendment to the United States Constitution, and article I, section 4 of the Hawai'i Constitution (1978). Effectively, the language of both is identical. *State v. Manzo*, 58 Haw. 440, 452, 573 P.2d 945, 953 (1977). In ruling on state law, this Court may look for guidance to federal case law interpreting similar provisions. *Pele Defense Fund v. Paty*, 73 Haw. 578, 603, 837 P.2d 1247, 1263 (1992) (citation omitted). Although this court may find that the Hawai'i Constitution affords greater free speech protection than its federal counterpart, Crosby has not urged such a holding and the federal decisions would afford

adequate protection in the context of the instant case. Consequently, we shall discuss, as the parties have, the first amendment to the United States Constitution as dispositive of the issues under article I, section 4 of the Hawai'i Constitution.

10. On May 18, 1992, the court issued an order denying Crosby's *motion to amend judgment, to* alter or modify judgment, [and/or] to order the taking of additional testimony. Although no reasons were given for denying this motion, it appears from our review of the record that the State was correct in arguing that the motion merely sought non-essential changes and additions.

Crosby attached an affidavit to his motion suggesting that retribution had in fact, contrary to FOF 85 (finding no evidence suggesting the potential for retribution in the future), taken place between final argument at trial and issuance of the court's judgment. The trial court properly rejected this argument, however, after careful consideration.

3. Further, there was no causal nexus between Crosby's expression of his First Amendment Rights and the reassignment of the tourism project at issue.

7. Circular 1977–3 is not a rule or regulation, but is merely a guideline that is not subject to the provisions of [HAPA].

## II. *Standards of Review*

Crosby has failed to specifically identify any relevant FOF as error,[11] and no plain error appears from the record; accordingly, the trial court's FOF are unchallenged for the purposes of appeal and, as such, are the operative facts of the case. *Leibert v. Finance Factors, Ltd.,* 71 Haw. 285, 288, 788 P.2d 833, 835, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1990).

 With respect to Crosby's challenges to COL 2 and 7, "[t]he interpretation of a statute is a question of law which this court reviews *de novo*. When construing a statute, our foremost obligation 'is to ascertain and give effect to the intention of the legislature,' which 'is to be obtained primarily from the language contained in the statute itself.'" *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 63, 868 P.2d 1193, 1210, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994) (citations omitted). However,

we have rejected an approach to statutory construction which limits us to the words of a statute . . . for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination.

*Id.* at 68, 868 P.2d at 1215 (Klein, J., dissenting) (citing *Treloar v. Swinerton & Walberg*

*Co.,* 65 Haw. 415, 421, 653 P.2d 420, 424 (1982)).

Thus, the plain language rule of statutory construction,

does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Survivors of Medeiros v. Maui Land & Pineapple Co.,* 66 Haw. 290, 297, 660 P.2d 1316, 1321 (1983)[.]

*Id.* at 68–69, 868 P.2d at 1215–16 (Klein, J., dissenting).

 Although COL 3 is set out as a conclusion of law, the trial court's label is not determinative of the standard of review. A determination that embraces an ultimate fact is a factual finding subject to the clearly erroneous standard of review even though classified as a COL. *Molokoa Village Dev. Co. v. Kauai Elec. Co.,* 60 Haw. 582, 596, 593 P.2d 375, 384 (1979); *see also Coll v. McCarthy,* 72 Haw. 20, 28, 804 P.2d 881, 886 (1991) (noting that mixed questions of fact and law are reviewed under the clearly erroneous standard). Accordingly, a COL, by which the trial court determines whether a party has met its burden of establishing elements of liability, is to be upheld unless clearly erroneous. *Molokoa Village,* 60 Haw. at 596, 593 P.2d at 384. Here, a causal connection between the speech and Crosby's removal is

---

**11.** Crosby indirectly challenges FOF 41, which he claims improperly

infers [sic] that he raised the conflict of interest issue *because* of the fact that "on February 3, 1989, he understood that if neither proposal succeeded then he would have an increased opportunity to persuade his superiors that the project should go bid [sic]" and as such is absolutely contrary to the evidence.

(Quoting from FOF 41.) Crosby's challenge reflects an attempt to bolster the contention that

his speech addressed a matter of public concern. As will be discussed in the following section, we agree in part with Crosby that his speech is entitled to constitutional protection; nonetheless, we conclude that the trial court correctly decided that no causal nexus existed between Crosby's expression and his reassignment. As such, the trial court's finding is not clearly erroneous.

necessary for Crosby to obtain relief. In the context of Crosby's challenge based on the HWPA, therefore, the trial court's determination of causation is reviewed under the clearly erroneous standard. *See Meyers v. Board of Trustees of Employees' Ret. Sys.,* 68 Haw. 94, 97, 704 P.2d 902, 905 (1985).

■ To the extent that Crosby's claim is based on his First Amendment Rights, *see supra* note 9 and accompanying text, however, we must make "an independent constitutional judgment on the facts of the case." *Connick v. Myers,* 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983) (citations omitted); *see also Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (plurality opinion) (noting that it is "agreed that it is the court's task to apply the *Connick* test to the facts").[12]

## III. *Discussion*

### A. *Application of the HWPA*

■ HRS § 378–62 provides in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment *because:* 1) The employee ... reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of a law or rule adopted pursuant to law of this State, a political subdivision of this State, or the United States, unless the employee knows that the report is false....

(Emphasis added). Crosby complains that the trial court construed the HWPA too nar-

rowly in COL 2 and that his removal affected a "condition" of employment. The State counters that the mere reassignment of a project within DBF could not have affected any "condition" of Crosby's employment; rather, DBF took appropriate management action.

The terms "compensation, terms, conditions, location, or privileges of employment" are not defined in HRS chapter 378. The ordinary definition of "condition" includes "[a]ttendant circumstances; existing state of affairs ..." (*Webster's New International Dictionary* 556 (2d ed. 1960)) and "situation with respect to circumstances; existing state or case...." *The Random House Dictionary of the English Language* 280 (Rev. ed. 1979). Clearly, one of the "circumstances" of Crosby's employment was that he was assigned to the project. A broad reading of the term "condition" in the HWPA is in accord with the legislative intent. *See* discussion *supra* section II (citing *Richardson* (Klein, J., dissenting), 76 Hawai'i at 68–69, 868 P.2d at 1215–16).

■ Legislative history confirms that the HWPA provides protection to employees who report suspected violations of law from "*any form of retaliation* by their employers." Sen.Stand.Comm.Rep. No. 1127, in 1987 Senate Journal, at 1392 (emphasis added). Specifically, the legislature intended that the HWPA bar "discharge, discrimination and *other forms of adverse action....*" Sen. Stand.Comm.Rep. No. 833, in 1987 Senate Journal, at 1249 (emphasis added). Furthermore, the HWPA is a remedial statute. *See Flores v. United Airlines, Inc.,* 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988) (citations

---

**12.** In *Waters,* the Justices of the United States Supreme Court split with respect to the factual basis for applying the *Connick* test, *see infra* section III.B. (citing *Connick,* 461 U.S. at 149, 150–54, 103 S.Ct. at 1691), on review of a lower court's grant of summary judgment in favor of a public hospital, which discharged an employee because of statements she made to a co-worker. The actual statements made by the employee were disputed.

As indicated previously, the facts are not disputed in the instant case, so we need not decide

whether the State's investigation met the *Waters* plurality's "reasonableness test." Nonetheless, were we to apply the test based on Crosby's indirect challenge to FOF 41, *see supra* note 11, the State's action would still pass constitutional muster. "[I]f the belief an employer forms supporting its adverse personnel action is 'reasonable,' an employer has no need to investigate further." *Waters,* —— U.S. at —— – ——, 114 S.Ct. at 1890–91. *See infra* section III.B. (listing evidence supporting the State's decision to remove Crosby from the project).

omitted). As such, the HWPA should be construed liberally to accomplish the purpose for which it was enacted. *Id.* (citation omitted); *see also Richardson* (Klein, J., dissenting), 76 Hawai'i at 68–69, 868 P.2d at 1215–16.

In order for an employee to prevail under the HWPA, however, the employer's challenged action must have been taken "because" the employee engaged in protected conduct in order to be considered "discriminat[ory]" under the HWPA. In other words, a causal connection between the alleged retaliation and the "whistleblowing" is required. The HWPA's legislative history indicates that the legislature intended that the required burden of proof be similar to that utilized in traditional labor management relations discharge cases. Under the National Labor Relations Act, as amended, 29 U.S.C. §§ 151–168 (1988), an employee has the burden of showing that his or her protected conduct was a "substantial or motivating factor" in the decision to terminate the employee. *See also Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 380, 652 P.2d 625, 631 (1982) (noting that "the plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy").

In reviewing an initial draft of the HWPA, the House Standing Committee reported:

the bill imposes the burden of proof on the employee and also establishes a higher standard of proof than normally applied in civil cases. Under existing custom and practice in labor management relations discharge cases, the burden of proof is placed on the employer. Accordingly,

your Committee amended the bill to remove subsection (d) of section –3, thereby maintaining the existing custom and practice of placing the burden of proof on the employer in discharge cases.

Hse.Stand.Comm.Rep. No. 25, in 1987 House Journal, at 1090.[13] We note, however, that an aggrieved employee always retains the ultimate burden of proof in a retaliatory discharge case. *Sonicraft, Inc. v. NLRB*, 905 F.2d 146, 150 (7th Cir.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991). The legislature must have been referring to the corresponding rule that "the burden of negating causation is on the employer." *Id.* Once the employee shows that the employer's disapproval of his first amendment protected expression played a role in the employer's action against him or her, "[t]he employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity." *NLRB v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir.1989) (citing *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983)). "In other words, the employer has an affirmative defense (no causation), as to which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts." *Sonicraft,* 905 F.2d at 150. Although "the trial court did not refer to any standard of proof" in its resolution of the instant case, "a presumption arises that it applied the correct standard." *State v. Aplaca,* 74 Haw. 54, 66, 837 P.2d 1298, 1305 (1992) (applying this rule in a criminal case where the trial court "merely commented on the nature of the evidence in support of the finding of guilt"; specifically, the trial court noted that the witness' testimony was more credible than the defendant's).

---

**13.** Subsection (d) of section –3 would have required that an employee bringing a challenge under the HWPA establish his or her claim under a "clear and convincing" standard of proof. H.B. No. 5 (1987). At the same time the legislature deleted this provision, it also added the following:

The rights created herein shall not be construed to limit the development of the common law nor to preempt the common law rights

and remedies on the subject matter of discharges which are contrary to public policy. In the event of a conflict between the terms and provisions of this part and any other law on the subject the more beneficial provisions favoring the employee shall prevail.

HRS § 378–69 (Supp.1992); *see also* Hse. Stand.Comm.Rep. No. 25, in 1987 House Journal, at 1090 (referring to *Parnar* ).

■ Crosby's argument is grounded on the testimony of Goda and Takushi to the effect that Crosby was removed from the project, in part, because of his expressed opinions. During oral argument Crosby's counsel protested that Crosby was removed from the project because he refused to lie by adding "sole source" or "non-competitive" language to the contract. The question of the State's motivation in removing Crosby is certainly susceptible to differing views. Nonetheless, there is substantial evidence in the record, *see infra* section III.B. (listing six relevant facts), to support the trial court's COL 2 and 3, as they pertain to COL 5.[14] The trial court did not err when it found that there was no causal nexus between Crosby's protected expression and his removal from the project, nor when it concluded that the State did not discriminate against Crosby regarding a condition of his employment.

In any event, we agree with the trial court's conclusions even on *de novo* constitutional review, as expressed in the following section.

### B. *Crosby's First Amendment Claim*

The question whether Crosby's expression was a "substantial or motivating factor" causing his removal from the project is presented in a slightly different context under Crosby's challenge to COL 3, which is based on his First Amendment Rights. As in section III.A., *supra*, the critical inquiry is whether the State, acting through Takushi, harbored an improper motive in removing Crosby from the project. Resolution of this issue in the first amendment context depends on a fine distinction between Crosby's expression and his conduct related to that expression.

■ The law in this area is well-settled. A public employee claiming that an employer's action violates the speech clause of the first amendment bears the initial burden of making a prima facie showing that 1) the conduct was constitutionally protected, and 2) the conduct was a "substantial" or "motivating" factor in the government's decision to take the challenged action. *Mt. Healthy v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Once that showing is made, the burden shifts to the government to show by a preponderance of the evidence that it would have reached the same decision absent the protected conduct. *Id.*

■ Crosby's discussion of public affairs (the expenditure of public funds) enjoys the highest first amendment protection. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *see also Pickering v. Board of Ed.*, 391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968) (high school teacher's criticism of board of education's allocation of public school funds was matter of "legitimate public concern").

In *Connick*, a New Orleans District Attorney (Petitioner) proposed to transfer an Assistant District Attorney (ADA or Respondent) to prosecute cases in a different section of the criminal court. Respondent strongly opposed the transfer, expressing her view to several of her supervisors, including Petitioner. She then prepared a questionnaire, which she distributed to the other ADAs, concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. Petitioner then informed Respondent that she was being terminated for refusal to accept the transfer and also told her that her distribution of the questionnaire was considered an act of insubordination. The trial court determined that the questionnaire was the real reason for Respondent's termination and that the Petitioner did not "clearly demonstrate[ ]" that the questionnaire interfered with the operation of the District Attorney's office. *Id.* 461 U.S. at 142, 103 S.Ct. at 1687. Accordingly, the trial court held that Respondent was wrongfully

14. COL 5 reads:

The State of Hawai['']i did not violate the Whis- tleblowers' Protection Act, Chapter 378, H.R.S.

discharged because she had exercised her constitutionally protected right of free speech regarding matters of public concern. *Id.* at 141, 103 S.Ct. at 1687. The United States Court of Appeals for the Fifth Circuit affirmed. *Id.* at 142, 103 S.Ct. at 1687.

The United States Supreme Court reversed in *Connick*, holding that Respondent's discharge did not offend the first amendment. The Court concluded that the only matter of public concern contained in the questionnaire was the question regarding pressure on employees to work in political campaigns. *See id.* at 148–49, 103 S.Ct. at 1690–91. With respect to Respondent's expression on that issue, the Court held that the balance between Respondent's interest in commenting on matters of public concern and Petitioner's interest in promoting efficient public service favored the latter. *Id.* at 150–54, 103 S.Ct. at 1692–93.

■ Although Crosby's expression was inextricably intertwined with his removal from the project, there is substantial, credible evidence to justify a reasonable conclusion that the State's primary motive in removing Crosby from the project was to ensure that the project was completed expeditiously. For example, Takushi testified at trial that he had *two* people to think about (Goda was apparently frustrated with Crosby's handling of the project) and that he felt DBF"s responsibilities would be executed more efficiently if the project were reas-

signed. Thus, the circuit court could reasonably conclude that it was not the fact that Crosby expressed his disapproval of Takushi's decision to employ a non-bid method of selection that prompted Takushi to remove Crosby from the project, but, rather, that Takushi's response was provoked by the delay and incompletion of the project and the "bad blood" occasioned by Crosby's consistent refusal to accept Takushi's final decision *after* Crosby had surfaced his opinions.

In support of this conclusion, the record contains substantial evidence that: 1) the efficient handling of the project was important to Takemoto; 2) Takushi made the decision to remove Crosby from the project; 3) Takushi was sincere in his beliefs that the project was "bogged down" and not moving forward, Crosby had lost his objectivity, tension had developed between Crosby and Goda, and the department would function more efficiently if Crosby was reassigned; [15] 4) Takushi predominantly based his decision on these beliefs; [16] 5) Takushi acted without animus; [17] and, 6) Crosby was never prohibited from speaking out about his concerns. In other words, the record supports the conclusion that Crosby's voiced concerns about the bid/non-bid issue were not a "motivating factor" in the State's decision to remove him from the project.

■ Even were we to assume that Crosby's protected conduct was a motivating factor in the State's decision to remove him,

---

15. At trial, the State could not identify any specific delay in the administration of the project attributable to Crosby and further acknowledged that it was Crosby's obligation to raise concerns with his supervisors. FOF 65. Nonetheless, "Takushi believed that the project was getting bogged down and was being delayed by Crosby's concerns, that Crosby was losing his objectivity because of his concerns, and felt that there was 'bad blood' between Goda and Crosby on the basis of a discussion that he held with Crosby three years earlier." FOF 64.

16. The following FOFs, which are particularly relevant to Takushi's perception that the project was unreasonably delayed, are supported by substantial evidence contained in the record:

 72. Takushi was not aware that the director had failed to select a contractor until February

23, 1989, more than five weeks after the January 20, 1989 selection deadline.
 73. Takushi was not aware that Erickson was in possession of the draft contract from March 8, 1989 to April 7, 1989.
 74. The personnel decision to reassign the tourism project from Crosby to another RASA was based on Takushi's concern that the project move forward, and his sense that the Department would function more efficiently if he was able to unhook the particular project from the Plaintiff.

17. The trial court found that "Takushi decided to remove the project from Crosby because the project was bogged down, not moving forward, because Goda showed his frustrations in dealing with Crosby's concerns, and because Plaintiff appeared to be losing his objectivity." FOF 70.

Takushi's actions are nevertheless consistent with Crosby's First Amendment Rights. Where a public employee's protected expression contributes to the employer's decision to take adverse action, the court must still determine whether the employer's decision was justified. *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Such a determination requires a delicate balancing of the employer's legitimate interest in the effective and efficient fulfillment of its responsibilities to the public and the employee's right, as a private citizen, to participate in discussions concerning public affairs. *Id.* at 150–54, 103 S.Ct. at 1692–93.[18] The State's interest has been aptly noted as follows:

> the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Id.* at 151, 103 S.Ct. at 1692 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). Most recently, the United States Supreme Court stated that:

> When someone who is paid a salary so that [he] will contribute to an agency's effective operation begins to ... detract from the agency's effective operation [by doing, saying, or failing to do certain things], the government employer must have some power to restrain [him].

. In the instant case, the balance of interests favors the State in light of the minimal bur-

den on Crosby's First Amendment Rights. The State's action was not drastic, Crosby was not prohibited from speaking out, he was not discharged or otherwise disciplined, and the reason for his removal had not been made public. Under these circumstances, Crosby's First Amendment Rights must yield. *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694.

### C. Alleged Violation of HAPA

■ Finally, Crosby asserts that the trial court erred in concluding that Circular 1977–3 is not subject to the strictures of HAPA.[19] COL 7 states that "Circular 1977–3 is not a rule or regulation, but is merely a guideline and is not subject to the provisions of [HAPA]."

The trial court's FOF 96, which is substantially supported in the record, states that:

> Circular 1977–3 is simply a guideline by the [DAGS] to the other department heads in the State of [Hawai'i], as to how the [DAGS] interprets Section 103–22, H.R.S., insofar as the sole source issue is concerned. Circular 1977–3 does not bind any member of the public nor any public employee with respect to any substantive right that may be inferred under Section 103–22, H.R.S. Rather, it is simply an *internal guideline* that the Comptroller may ignore or not. Further, the Government may also ignore it.

(Emphasis added.) Circular 1977–3 was sent only to other state agencies and does not command or prohibit any action by any member of the public or any public employee. *See Doe v. Chang,* 58 Haw. 94, 96, 564 P.2d 1271, 1273 (1977) (holding that agency manual, which did not "command the public to do

---

**18.** The proper balancing requires an independent constitutional judgment by the reviewing court. *Id.* at 150 n. 10, 103 S.Ct. at 1692 n. 10 (citations omitted). *See also Waters,* — U.S. at —, 114 S.Ct. at 1884.

**19.** HRS § 91–1(4) (1985) provides that:
"Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law

or policy, or describes the organization, procedure, or practice requirements of the agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91–8, nor interagency memoranda.

anything, prohibit the public from doing anything or declare the rights of the public in any respect [nor] make any procedures available to the public[,]" was not a rule or regulation under HAPA). By the clear language of HRS § 91–1(4), therefore, HAPA does not apply and COL 7 is not wrong.

## IV. *Conclusion*

The trial court's determination that there was no causal connection between Crosby's expression and his reassignment is not clearly erroneous. Although we are persuaded that the removal of Crosby from the project affected a condition of his employment, the record establishes that this action was not undertaken because Crosby engaged in protected conduct; the State, therefore, did not violate the HWPA or the first amendment when it reassigned the project to someone else. Finally, the DAGS did not violate HAPA when it circulated a memorandum to other state agencies interpreting the "sole source" provisions of Hawai'i purchasing law.

Judgment affirmed.