**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000311
28-AUG-2020
07:45 AM

NO. CAAP-18-0000311

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

DIXON Q.H. DUNG,
Plaintiff-Appellant,
v.
SHELLY EUROCARS, LLC, DBA BMW OF HONOLULU,
A DOMESTIC LIMITED LIABILITY COMPANY,
Defendant-Appellee,
and
DOE INDIVIDUALS; DOE ENTITIES 1-10; DOE GOVERNMENT ENTITIES 1-10,
Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 15-1-0126)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Chan, JJ.)

This appeal arises from an alleged violation of the Hawaiʻi Whistleblowers' Protection Act (HWPA). Plaintiff-Appellant Dixon Q.H. Dung (Dung) appeals from the March 8, 2018 Final Judgment, entered by the Circuit Court of the First Circuit (circuit court).[1] The Final Judgment was entered pursuant to the order granting summary judgment in favor of Defendant-Appellee Shelly EuroCars, LLC dba BMW of Honolulu, a Domestic Limited Liability Company (BMW), entered on the same day.

Dung argues that the circuit court erred in granting

---

[1] The Honorable Gary W.B. Chang presided.

summary judgment because it erroneously concluded that: (1) Dung did not engage in any protected activity that would trigger a violation of the HWPA; and (2) Dung failed to demonstrate a causal connection between his complaints to management and his employment termination.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve this appeal as follows and affirm.

We review a circuit court's grant of summary judgment de novo using the same standard applied by the circuit court. Nozawa v. Operating Engineers Local Union No. 3, 142 Hawaiʻi 331, 338, 418 P.3d 1187, 1194 (2018).

Under HRS § 378-62 (2015), the HWPA provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:

(A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or

(B) A contract executed by the State, a political subdivision of the State, or the United States,

unless the employee knows that the report is false; or

(2) An employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

To prevail on an HWPA claim, an employee must prove the following elements: (1) the employee engaged in protected conduct under the HWPA; (2) the employer took an adverse employment action against the employee; and (3) a causal connection exists between the employee's protected conduct and the employer's adverse action (i.e., the employer's action was taken because the employee engaged in protected conduct; the employee has the

burden of showing that the protected conduct was a "substantial or motivating factor" in the employer's decision to take the employment action).  See Crosby v. State Dep't of Budget & Fin., 76 Hawaiʻi 332, 341-42, 876 P.2d 1300, 1309-10 (1994).  Only the first and third elements of an HWPA claim are at issue in this case.

The employer carries the burden of negating causation only after the employee first demonstrates a prima facie case of causal connection.  Id. at 342, 876 P.2d at 1310.  "Once the employee shows that the employer's disapproval of [the employee's protected activity] played a role in the employer's action against him or her, the employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity."  Id. (original brackets, internal quotation marks, and citation omitted).  "[I]f the employer rebuts the prima facie case, the burden reverts to the [employee] to demonstrate that the [employer's] proffered reasons were 'pretextual.'"  Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 14, 346 P.3d 70, 83 (2015) (quoting Shoppe v. Gucci Am., Inc., 94 Hawaiʻi 368, 379, 14 P.3d 1049, 1060 (2000)) (describing the similar burden-shifting analysis that Hawaiʻi courts use when analyzing a claim of age discrimination that relies on circumstantial evidence); see also Crosby, 76 Hawaiʻi at 342, 876 P.2d at 1310 (concluding that the HWPA follows the same burden of proof used in "traditional labor management relations discharge cases").  "Although Crosby reviewed a ruling entered after a jury-waived trial, this court and the United States District Court for the District of Hawaiʻi have applied the HWPA burden-shifting analysis at summary judgment."  Dobbs v. Cty. of Maui, No. CAAP-16-0000577, 2019 WL 762407, at *2 (Haw. App. Feb. 20, 2019) (SDO).

Dung was employed by BMW as a shuttle driver until his employment was terminated on June 6, 2014.  Dung's termination report stated that Dung was terminated because he was sleeping on

the job on June 3, 2014, in the customer lounge with a television remote in his hand.  Dung, however, filed suit asserting that his termination was in retaliation for complaints he previously made to management.  The complaint at issue is a January 13, 2014 letter to the office manager, in which Dung related his concerns that Mark Hironaka (Hironaka), Dung's immediate supervisor, violated Dung's constitutional right to privacy by making remarks to other employees regarding a January 9, 2014 meeting that occurred between Dung, Hironaka, the office manager, and other managers, regarding an incident with a customer.  In the letter, Dung asserted that after the meeting, Hironaka "blatantly bragged to [other employees] how he covered and countered everything that [Dung] said [at the meeting.]"  Dung alleged that the complaint he made in the letter was a substantial or motivating factor in the decision to terminate him.

As to the first element, Dung argues that his complaint to management was protected conduct that triggered the HWPA because he reported a violation of his right to privacy and his right not to be placed in a false light.

The January 9, 2014 meeting stems from a December 2013 incident involving Dung and an African-American customer he was supposed to pick up.  The customer had expected to be picked up at his house but Dung asked the customer to instead walk to a different location where Dung was already waiting.  Dung eventually picked up the customer and returned to the store. After dropping the customer off at the store, Hironaka approached Dung and made a statement to the effect of "you have to watch out what you say" and the customer "might go and see [the president of the company.]"  Dung interpreted Hironaka's comments to mean that Dung had made a remark to the customer that offended him and that if the customer was not happy with his ride, he could make a complaint to the president of the company.  Dung wrote a letter to the office manager, expressing his concern that Hironaka was accusing him of making racially insensitive remarks or engaging

in discriminatory conduct.  The office manager then scheduled the January 9, 2014 meeting to discuss the matter.

According to the office manager, the purpose of the January 9, 2014 meeting was to discuss the December 2013 incident with the customer:

> I recall that it started because [Hironaka] made a remark to [Dung] about [the customer] being black, and [Dung], he didn't want [the customer] to explain to [the president of the company].  And so because he said that, [Dung] was concerned about that and made a complaint.  He wanted to know why [Hironaka] made that statement, so that was what the meeting was about.

Dung similarly believed that the purpose of the January 9, 2014 meeting was to "clear the air regarding the [December 2013 conversation with Hironaka] . . . as far as what had happened with [the customer's] pickup[.]"  Dung stated that there was no agreement during the meeting that the discussions were to be kept confidential, but he thought it was a private meeting because it pertained to personnel issues.

Dung was later informed by another employee that, after the meeting, Hironaka had discussed with two other employees what occurred at the meeting and "bragged" about countering everything Dung said.  Dung then wrote the January 13, 2014 letter to the office manager asserting that Hironaka had violated Dung's right to privacy and defamed him.

Dung concedes that "defamation is a wholly separate common law tort that has no constitutional basis."  However, Dung argues that his January 13, 2014 letter was a report of a violation of his right not to be placed in a false light, which has its basis in the constitutional right to privacy.

The constitutional right to privacy is recognized under article I, section 6 of the Hawaiʻi State Constitution.  Haw. Const. art. 1, § 6 ("The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest.").  The privacy right in article I, section 6 "concerns the possible abuses in the use of <u>highly personal and intimate information</u> in the hands of government or

private parties[.]" Comm. of the Whole Rep. No. 15, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 1024 (emphasis added). In discussing the creation of the right to privacy "as it relates to privacy in the informational and personal autonomy sense" under article I, section 6, the standing committee report of the 1978 Constitutional Convention of Hawai'i stated:

> Your Committee believes that the right of privacy encompasses the common law right of privacy or tort privacy. This is a recognition that the dissemination of private and personal matters, be it true, embarrassing or not, can cause mental pain and distress far greater than bodily injury. For example, the right can be used to protect an individual from invasion of his private affairs, public disclosure of embarrassing facts, and publicity placing the individual in a false light.

Stand. Comm. Rep. No. 69, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 674. The supreme court has recognized a tort claim for false light invasion of privacy, thereby recognizing "false light" as a type of tort under the common law right to privacy. Chung v. McCabe Hamilton & Renny Co., Ltd., 109 Hawai'i 520, 534-35, 128 P.3d 833, 847-48 (2006). The supreme court cited Restatement (Second) of Torts § 652E (1997) for the definition of the tort of false light invasion of privacy as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Chung, 109 Hawai'i at 534 n.18, 128 P.3d at 847 n.18.

Dung stated that he believed the discussions during the January 9, 2014 meeting were of a private nature. To the contrary, the record reflects that the meeting discussions simply revolved around determining the facts of the December 2013 incident. Even if Dung's allegations of Hironaka's bragging were

true, Hironaka's comments did not place Dung in a false light for purposes of violating the <u>constitutional right to privacy</u>. There was no "highly personal [or] intimate information" involved in the January 9, 2014 meeting itself or in Hironaka's purported bragging and therefore no violation of Dung's constitutional right to privacy.

The circuit court therefore correctly concluded that Hironaka's alleged wrongful conduct did not fall within the constitutional right of privacy and that Dung's January 13, 2014 letter therefore did not, as a matter of law, constitute a report of a violation or a suspected violation of state or federal law sufficient to support a claim under the HWPA.

Even assuming arguendo that Dung engaged in protected activity under the HWPA, Dung failed to raise genuine issues of material fact as to whether there was a causal connection between his alleged protected conduct and the termination of his employment.

Dung asserts that the temporal proximity between his complaint letter and his termination would permit a trier of fact to infer a causal connection between the two. Dung wrote the letter to the office manager on January 13, 2014, and was terminated June 6, 2014. The relative temporal proximity of his termination to his alleged protected conduct may amount to circumstantial evidence of causation or an inference of such, for a prima facie case. <u>See</u> <u>Taqupa v. VIPdesk, Inc.</u>, 125 F. Supp. 3d 1108, 1122 (D. Haw. 2015) ("Given a relatively short time, however, between at least some of her protected activity [(occurring in March and August 2011)] and her termination [(occurring September 2011)] . . . , questions of material fact exist as to whether Taqupa's actions were a 'substantial or motivating factor' in her termination." (citation omitted)); <u>but see</u> <u>Aoyagi v. Straub Clinic & Hosp., Inc.</u>, 140 F. Supp. 3d 1043, 1060 (D. Haw. 2015) ("As an initial matter, courts generally reject causation for purposes of retaliation claims where the

alleged adverse action by the employer occurs months or years after the alleged protected activity." (citing <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (per curiam) (stating that where "mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action [is] sufficient evidence of causality . . . the temporal proximity must be very close," and noting that courts have rejected causation where there are three- or four-month time gaps), and <u>Manatt v. Bank of Am., NA</u>, 339 F.3d 792, 802 (9th Cir. 2003) (holding that a nine-month gap between protected activity and adverse employment action "suggests no causality at all")). However, aside from the mere fact of relative temporal proximity, Dung has not shown that his alleged protected conduct was a "substantial or motivating factor" in BMW's decision to terminate his employment.

Even if Dung established a prima facie claim based on temporal proximity, BMW maintains that Dung's termination would have occurred regardless of his alleged protected activity. In support of its motion for summary judgment, BMW produced evidence that on May 9, 2014, Dung received a written warning from Al Roberts (Roberts), the service manager, stating: "[Dung] was reported sleeping in the customer lounge. 2nd complaint of this in 2 weeks. First one was sleeping while a customer was waiting in lounge for a shuttle. Nightshift. This incident was not documented prior nor addressed." Dung was instructed not to use the customer lounge or private offices for breaks and instructed to instead use break rooms. In the "Employee Statement" portion of the warning form, Dung checked off the box stating "I agree with Employer's statement" and handwrote "as stated by customer" next to the checked statement. Dung did not deny that he was sleeping. Dung signed and dated the form to indicate that he read and understood the warning.

Despite the May 9, 2014 warning, Roberts was informed that Dung was again observed to have been sleeping on the job on

June 3, 2014.  This incident resulted in his termination on June 6, 2014.  In his deposition, Roberts testified that he did not recall the employee that first notified him of this incident and explained: "I was walking in front of the parts department, . . . and there were many people approaching me on it, right.  I thought the person was our in-house janitor, that's who I recall made the first comment, so that's what I thought and that's what I documented."  Roberts further stated: "[P]eople came to me, service advisers, talking about a customer, that was sitting next to [Dung] or in the area with him, that was upset because he was waiting for a shuttle."  Roberts testified that he terminated Dung's employment "[f]or sleeping in [the] customer area, disrupting customer service.  After I talked to him about it, I expect people to pay attention and he didn't pay attention[.]"

> Dung recounted his termination meeting as follows:
>
> [A]  . . . And as I walked in [to Roberts's office], I recall him, like, holding a piece of paper in the air and shaking it and he says I'm sorry, he says, I'm going to have to let you go.  I'm sorry.  He said someone else saw you sleeping again.
>
> . . . .
>
> Q  So what did Al Roberts say to you and what did you say to him?
>
> A  Well, he had the form already filled out.  And he told me that like I say, when I first walked in, he says I'll give you two choices.  You either have the right to resign or I can terminate you.  And I said I'm not going to resign.  He said okay, I'm just going to sign the dismissal form.
>
> Q  And did he tell you why you were being terminated?
>
> A  Well, like I say, he said in his statement as he was holding the paper <u>he said someone else saw you sleeping again.  And so that's, I assume, is why he was terminating me.</u>

(Emphasis added.)  Dung agreed that he was in the customer lounge watching television that evening.

Dung did not offer any evidence that BMW's proffered reasons for his termination were pretextual.  See Adams, 135 Hawaiʻi at 14, 346 P.3d at 83.  Notably, Roberts did not begin

his employment at the BMW of Honolulu store in this case until April 1, 2014, months after the January 13, 2014 letter and the incidents leading up to the letter.[2]  Roberts testified that the decision to terminate Dung was entirely his, that he did not discuss the decision with anybody else in management, and that he was unaware of Dung's previous complaints.  Dung did not put forth any evidence that Roberts knew about Dung's complaints in the January 13, 2014 letter, which Dung alleges was protected conduct under the HWPA.

Having brought forward no evidence of a causal connection between his alleged protected activity and his termination or that the proffered reasons for his termination were pretextual, Dung failed to raise a genuine issue of material fact regarding his HWPA claim.  The circuit court therefore did not err in concluding that BMW was entitled to summary judgment as a matter of law.

Based on the foregoing, we affirm the March 8, 2018 Final Judgment, entered by the Circuit Court of the First Circuit.

DATED:  Honolulu, Hawaiʻi, August 28, 2020.

On the briefs:

Richard C. DeWaele,
for Plaintiff-Appellant.

Richard M. Rand,
(Marr Jones & Wang),
for Defendant-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Derrick H. M. Chan
Associate Judge

---

[2]     Prior to April 1, 2014, Roberts had worked at BMW of Honolulu between 2003 and 2007 and then worked at BMW of San Antonio.