GRACE TOMOYO MOCK, Plaintiff-Appellant/Cross-Appellee
v.
ENCARNACION CASTRO and CARMELITA RODRIGUEZ, Defendants-Appellees/Cross-Appellants and
DEPARTMENT OF HEALTH, STATE OF HAWAI`I, FRED HORWITZ, Individually and in his capacity as the Administrator of Leahi Hospital, CARLINA RIVERA, Individually and in her capacity as the Head Nurse, Young 4, Leahi Hospital, LILY ARISTA, KAUIONALANI CASTILLO, LEONILA STONE, and PAULINE YUEN, Defendants-Appellees. and
JOHN DOES 1-10 and JANE DOES 1-10, Defendants.
No. 23474
In the Supreme Court of Hawaii.
September 3, 2004.
Clayton C. Ikei and Jerry P.S. Chang for plaintiff-appellant/cross-appellee.
Roy A. Vitousek III and Kristin S. Shigemura, (Cades Schutte Fleming & Wright) for defendants-appellees/cross-appellants.
Kenneth S. Robbins, Vincent A. Rhodes, Charla J.H. Murakami, and William N. Ota (Robbins & Rhodes) for defendants-appellees.

MEMORANDUM OPINION
NAKAYAMA, ACOBA, AND DUFFY, JJ.; With LEVINSON, J., Concurring Separately; and MOON, C.J., Dissenting.
Plaintiff-Appellant/Cross-Appellee Grace Tomoyo Mock (Plaintiff) brought suit (1) against Defendants-Appellees Department of Health (DOH), State of Hawai`i, Leahi Hospital (the Hospital), Fred Horwitz (Horwitz), the Hospital's Administrator, and Carlina Rivera (Rivera), the Head Nurse of the Hospital's "Young 4 Geriatric Ward" (Young 4), asserting (a) freedom of speech violations under Article I, section 4 of the Hawai`i State Constitution and the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 (§ 1983) and (b) Hawai`i "Whistleblowers' Protection Act" (HWPA) claims under Hawai`i Revised Statutes (HRS) § 378-61 et. seq.; (2) against Defendants-Appellees/Cross-Appellants Encarnacion Castro (Castro) and Carmelita Rodriguez (Rodriguez) [Castro and Rodriguez are hereinafter collectively referred to as Cross-Appellants[1], Rivera, Defendants-Appellees Lilly Arista (Arista), Kauionalani Castillo (Castillo), and Leonila Stone (Stone) [all Defendants-Appellees and Cross-Appellants are hereinafter collectively referred to as Defendants], for defamation; (3) against Cross-Appellants, Rivera, Arista, Castillo, Stone and Defendant-Appellee Pauline Yuen (Yuen), for civil conspiracy, based on the freedom of speech and HWPA claims.[2]
On March 2, 1998, the first circuit court (the court)[3] granted Defendants' motion for partial summary judgment and dismissed, with prejudice, Plaintiff's § 1983 damages claims against DOH, State of Hawai`i, and Horwitz and Rivera, in their official capacities. On September 22, 1999, the court granted Defendants' request for attorney's fees, in part, as to fees incurred in the defense of such § 1983 damages claims.
A jury trial was held in late April through early May of 1999. After Plaintiff's case in chief, the court granted Defendants' motion for a directed verdict as to Plaintiff's allegations of (1) freedom of speech violations that remained, (2) HWPA violations, (3) civil conspiracy, and (4) defamation as to Arista, Castillo, and Stone, finding that there was no evidence the publications by them were false.[4]
The remaining claims, namely the defamation claims against Castro, Rivera, and Rodriguez, were submitted to the jury. It returned a verdict finding that Castro and Rodriguez, but not Rivera, had defamed Plaintiff, and awarded damages accordingly.[5] On September 24, 1999, Defendants filed their notice of taxation of bill of costs.
Judgment was entered on March 30, 2000, (1) in favor of Defendants as to Plaintiff's freedom of speech claims and HWPA claims; (2) in favor of Plaintiff against Castro and Rodriguez, jointly and severally, as to the defamation claim, for special damages in the amount of $7,600 and general damages in the amount of $21,000, plus costs; (3) against Cross-Appellants, individually, for punitive damages, in the amount of $25,000 each; (4) in favor of Arista, Castillo, Rivera, and Stone on Plaintiff's defamation claim; (5) in favor of Defendants for attorney's fees in the amount of $109,344 incurred in defending on Plaintiff's § 1983 claims; and (6) costs in the amount of $14,386.[6]
Plaintiff appeals from the March 30, 2000 final judgment of the court, except with respect to her defamation claims. Cross-Appellants cross appeal from (1) the court's denial, in part, of their motion for directed verdict, filed June 30, 1999, and (2) the court's denial of their motion for judgment notwithstanding the verdict (JNOV), filed March 30, 2000.[7]
For the reasons set forth below, the final judgment is vacated as to (1) the directed verdict against Plaintiff's HWPA claims brought against Rivera, (2) the directed verdict against Plaintiff's civil conspiracy claims related to her HWPA claims, and (3) the award of attorney's fees to Defendants. On all other grounds the March 30, 2000 final judgment is affirmed.

I.
Plaintiff, who has been employed at the Hospital since 1992, testified to the following at trial. In 1995, Plaintiff noticed that the night shift staff members were sleeping for over an hour on their breaks in violation of the Hospital rules. In May of 1995, Plaintiff reported this to Rivera, the head nurse of the Young 4 ward. The violations stopped for a while, but then resumed. Six months later Plaintiff again reported that staff members were sleeping. In May of 1996, Plaintiff was temporarily assigned to another floor at the Hospital. While working in that unit, she noticed some of the elderly patients had significant skin problems. Plaintiff reported her observations, and the sleeping nurses at Young 4, to Detta Makaula (Makaula), a senior manager for training at the Hospital. Makaula scheduled a meeting with Plaintiff and Rivera the next day, where Plaintiff also informed Rivera of the sleeping nurses. Shortly thereafter, five nurses and nurses aides were discovered sleeping, and put on administrative leave.[8]
After these five were placed on administrative leave, Plaintiff maintains that "she began to experience hostility from her co-workers and her supervisors." For example, Plaintiff related that Stone confronted her as being the one who reported the sleepers.[9] Plaintiff testified that in September of 1996, Rodriguez, a sister-in-law of one of the sleepers, and Dominador Adiviento, a nurse's aide, prepared a report complaining that Plaintiff engaged in a long phone conversation with Margaret Granger (Granger).[10] In December 1996, Rodriguez prepared a statement, also signed by Nelia Dumalag (Dumalag) and Castillo, accusing Plaintiff of sleeping on the job around nine months prior, in March 1996.[11] Plaintiff also referred to a June 17, 1996 memorandum from Betty Nakaji, the Director of Nursing for the Hospital, to Horwitz, charging that Plaintiff was shifting the blame to the other nurses.[12]
Plaintiff also argues that she "was subject to disciplinary and disparate action from [Rivera,] her supervisor[,]" after the sleepers were removed and placed on administrative leave.[13] First, Plaintiff testified that although Jean Miyamura, the assistant director of nursing, recommended that both Plaintiff and Granger be given counseling letters for their telephone conversation of September 24, 1996, Rivera issued a letter only to Plaintiff. Rivera acknowledged that Plaintiff was the only person to whom she had ever issued such a letter for being on the phone for more than five minutes. Rivera also called a meeting with Plaintiff and accused her of cooking on the floor and "of not putting out an intake and output sheet," which Plaintiff maintains "was not her assignment."
According to Plaintiff, "matters came to a head on January 27, 1997, when [she] was accused of patient neglect." Plaintiff acknowledged that on December 23, 1996, she mistakenly cared for the wrong patient on her first round, instead of a patient (Patient) she was assigned to.
She testified that she was called into Rivera's office on January 27, 1997. Rivera told her that somebody had reported that Plaintiff had missed Patient on December 29, 1996. Plaintiff explained that the incident occurred on December 23, 1996, not on December 29, 1996, but that she attended to Patient as soon as she realized that she made a mistake, and returned an additional time to compensate. Plaintiff recalled that Rivera told her to fill out the incident report with the erroneous December 29th date, despite her explanations that it had occurred earlier. Upon submitting the report, Plaintiff recalled that Rivera glanced at the report for a few seconds and replied, "You're the perpetrator. You're suspended." Plaintiff also asserts that Rivera "[r]eviewed [Patient's] medical chart on January 27, 1997, [and] noted that there was a total absence of any notation of distress or unusual condition in [Patient's] chart."[14] Despite this knowledge, Rivera omitted this fact when she wrote a summary report to the management staff on January 29, 1997.[15] Plaintiff recounted that she subsequently found that her notes from December 23, 1996 supported the December 23, 1996 date.
Horwitz testified that in December of 1996, he had read a news article about an unrelated case in which Plaintiff had brought suit against Hale Malamalama. In the article, Plaintiff criticized Gerald Chung, an acquaintance of Horwitz's, as well as the Hospital and Medical Facilities Branch of the Department of Health.[16] Horwitz acknowledged that in the same month, he saw a newscast about the sleepers at the Hospital. It upset him, and he ordered a copy of the newscast and referred the matter to the Attorney General's office as it portrayed a Hospital employee in an unfair light. Horwitz discussed the story with senior managers, and the extent of information which was released. During these conversations, Plaintiff's name came up.
On January 30, 1997, Horwitz sent Plaintiff a certified letter advising her she would be removed from her nursing duties pending the investigation of patient neglect, and that she would be assigned to the Dietary Department in the interim. Plaintiff recalls that she was required to do the mail runs at the nursing office, and felt humiliated and ashamed that "they wanted to parade me in front of them." Plaintiff was also required to obtain permission from Rivera to go to her locker located in Young 4, or to visit her uncle who was also located at Young 4. Slyvia Sugimoto (Sugimoto), a social worker, conducted an investigation of the allegations against Plaintiff, on behalf of Adult Protective Services (APS), a division within the Department of Human Services. She completed the APS investigation in early February 1997 and concluded that the allegation of patient neglect against Plaintiff was not confirmed.
Horwitz appointed James Asato (Asato) and Yuen, as in-house investigators, to review the allegations against Plaintiff. Yuen testified that although Plaintiff informed them that her mistake occurred on December 23, 1996, they did not determine whether the events took place on December 23, 1996, because their "assignment was to investigate the incident that happened on December 29, 1996" and Yuen thought it would "open up a can of worms."[17] Ultimately, Yuen and Asato concluded that the charge of patient neglect had been substantiated, and they recommended that Plaintiff be reassigned, preferably to a position outside of nursing.
Julie Noji, as part of her duties as the personnel director of the Hospital, conducted a "just cause" review of the investigative reports of Asato and Yuen,[18] and found the charge of neglect was not substantiated. Noji testified that she found that the investigation "was not fair and objective" as stated in her just cause report. In May of 1997, Noji submitted her draft report to Horwitz, which they discussed. However, the final report was not submitted until January of 1998, after Horwitz left the job.
Defendants, in a letter to Plaintiff dated July 11, 1997, proposed that the parties should "attempt to work out ground rules for [Plaintiff's] return to her duties as soon as [they could]." (Emphasis added.) Plaintiff did not follow through on the proposal to return to Young 4, see infra, but, on June 14, 2000, Plaintiff was assigned to the nursing floor of Young 3.[19]

II.
On appeal, Plaintiff argues that the court erred in: (1) granting a directed verdict as to Plaintiff's claims of freedom of speech violations under the Article I, § 4 of the Hawai`i State Constitution and the First and Fourteenth Amendments to the United States Constitution and § 1983; (2) granting a directed verdict as to her HWPA claims under HRS § 378-61 et. seq.; (3) granting a directed verdict as to her civil conspiracy claim; (4) awarding Defendants attorney's fees and costs as to Plaintiff's § 1983 claims against Horwitz and Rivera in their official capacities; and (5) excluding Plaintiff's videotape of a newscast, correspondence, and minutes evidencing her attendance at public hearings.
In their cross appeal, Cross-Appellants argue that the court erred (1) in denying a directed verdict as to Plaintiff's defamation claims; (2) in denying their motion for JNOV as to punitive damages awarded to Plaintiff resulting from her defamation claims; and, (3) in denying remittitur or a new trial.

III.
It is well settled that denials of motions for a directed verdict or JNOV are reviewed de novo; thus we apply the same standard as the trial court. O'Neal v. Hammer, 87 Hawai`i 183, 186, 953 P.2d 561, 564 (1998); see Ho v. Leftwich, 88 Hawai`i 251, 256, 965 P.2d 793, 798 (1998). "In deciding a motion for directed verdict or JNOV, the evidence and the inferences therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only when there can be but one reasonable conclusion as to the proper judgment." O'Neal, 87 Hawai`i at 186, 953 P.2d at 564. This court has explained that
[a] directed verdict may be granted only when[,] after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.
Ho, 88 Hawai`i at 256, 965 P.2d at 798 (citations and brackets omitted).
Accordingly, "`verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings.'" State Savings & Loan Ass'n v. Corey, 53 Haw 132, 141-42, 488 P.2d 703, 709 (1971). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai`i 494, 502, 880 P.2d 169, 177 (1994).

IV.
As to her free speech claims, Plaintiff asserts that (1) the court erred "when it balanced [Plaintiff's] free speech interest" against the State's interest; (2) "[i]t has long been established that in personnel matters, an agency must adhere to its own rules and regulations[,] Service v. Dulles, 354 U.S. 363 (1957)";[20] and (3) the court erred in ruling that the transfer and reassignment did not impair her ability to speak out.
In Crosby v. State Dep't of Budget & Fin., 76 Hawai`i 332, 343, 876 P.2d 1300, 1311 (1994), this court held that a public employee claiming that an employer's action violates rights to free speech bears the initial burden of making a prima facie showing that (1) the conduct was constitutionally protected and (2) the conduct was a "substantial" or "motivating" factor in the government's decision to take the challenged action. "Once that showing is made, the burden shifts to the government to show by a preponderance of the evidence that it would have reached the same decision absent the protected conduct." Id.
In granting Defendants' motion for a directed verdict, the court applied Crosby's aforementioned two-prong analysis, and found that (1) Plaintiff's criticism of the DOH and the reporting of those found sleeping related to matters of legitimate public concern protected by the First Amendment and state law; and (2) such statements by Plaintiff could have been "the primary or at least substantial motivating factors of the State's action."[21] However, the court decided that "Plaintiff's First Amendment rights must yield to the State's legitimate interest in this case." The court employed the Crosby balancing test, and found that
the adverse action here means the removal and continued removal of Plaintiff. . . . In this case, the State interest is protection of public safety, particularly of the elderly, and enforcement of neglect and abuse reporting laws and procedures. State policy plus applicable union contract allowed Plaintiff's reassignment pending the outcome of the investigation. The court finds that in this case Plaintiff had already exercised her First Amendment rights and no restrictions were placed upon her future exercise of those same protected rights. The court finds that the adverse action taken by the State was not drastic. Plaintiff continued working. Plaintiff was not discharged. Plaintiff was offered the opportunity to return to Young 4 in July 1997, but refused and continues to refuse to do so. Plaintiff was not disciplined, and her personnel file has been expunged.
(Emphasis added.)
Based on such considerations, the State established that "it would have reached the same decision absent the protected conduct." Crosby, 76 Hawai`i at 343, 876 P.2d at 1311. Accordingly, the court was not wrong in granting the motion for directed verdict in favor of Defendants Horwitz and Rivera on these grounds.

V.
Next, Plaintiff contends the court erred in granting Defendants' directed verdict as to her HWPA claims. The HWPA is codified in Part V of HRS chapter 378, entitled "Employment Practices." HRS § 378-62 (Supp. 2001) provides, in pertinent part, as follows:
Discharge of, threats to or discrimination against an employee for reporting violations of law. An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, privileges of employment because:
(1) the employee . . . reports . . . to a public body, verbally or in writing, a violation or a suspected violation of a law or rule adopted pursuant to the laws of this State . . . .
Plaintiff argues that the court erred because (1) Horwitz and Rivera did not "consider all available evidence" as required by the Hospital procedures prior to altering Plaintiff's work status, (2) Plaintiff's reassignment was discriminatory as compared to those caught sleeping, who received leave with pay, and (3) the "continued removal and reassignment of the Plaintiff was not justified after the exculpatory evidence became known to Defendants."
The court decided that
no reasonable jury could find that Defendant Horwitz did anything contrary to what he was mandated to do by law, policy and existing procedures adopted before and after the statement of deficiency. Specifically, the court refers to [HRS] §§ 346-222, 346-224, and Exhibits 14, 10, 90, 54, and 53.[[22]] Additionally, the court finds it significant that Plaintiff admitted to and did not dispute her failure to attend to the patient in question, on the date alleged, in the first round. The court finds that Defendants acted on Plaintiff's admission in removing and reassigning Plaintiff. The court finds that, in light of Plaintiff's admission, the suggestion that Defendants should look at the medical records is less compelling. Further, the court finds that Plaintiff failed to raise the dispute as to the fact of her lack of attendance to the patient until February 12, long after the allegedly adverse state action. Based on the foregoing, a jury could not find that there was discrimination against Plaintiff in her removal and reassignment. Thus the court GRANTS the motion in favor of Defendants [DOH], State of Hawai`i, Horwitz and Rivera on Plaintiff's [HWPA] claim.
(Emphases added.)
This court has reasoned that "[i]n order for an employee to prevail under the HWPA, . . . the employer's challenged action must have been taken `because' the employee engaged in protected conduct in order to be considered discriminatory' under the HWPA." Crosby, 76 Hawai`i at 342, 876 P.2d at 1310 (brackets omitted). "[A] causal connection between the alleged retaliation and the `whistleblowing' is required." Id. Thus, an employee has the burden of showing that his or her protected conduct was a "substantial or motivating factor" in the decision to take an adverse action against an employee. Id. (explaining that the legislature intended the burden of proof for HWPA claims "to be similar to that utilized in traditional labor management cases," in which employees have the burden of showing their protected conduct was the a "substantial or motivating factor" in the decision to terminate an employee). In the present case, the "motivating factor" for Defendants' investigation and transfer of Plaintiff may be susceptible to differing views. See id. at 343, 876 P.2d at 1311. However, this court has said that "`the employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity.'" Id.

A.
First, Plaintiff's arguments as raised against Horwitz must be considered. As to Plaintiff's first point, that Horwitz failed to consider all available evidence before transferring her out of Young 4, the court found that "in light of Plaintiff's admission, the suggestion that Defendants should look at the medical records is less compelling." Once Horwitz received the report of abuse, the Hospital's Plan of Correction called for "immediate action" to be taken to "remove the alleged perpetrators from the unit or area." Plaintiff does not explain why the policy to review all information should supercede the Hospital's policy to remove those accused of negligence during an investigation.
As to Plaintiff's second point, that her transfer was discriminatory in light of the sanctions meted out against those sleeping, Horwitz testified at trial that the senior management team at the Hospital found it nearly impossible to place all of those caught sleeping in alternative non-patient-care positions at the Hospital. Thus, they were given leave with pay instead.
Regarding Plaintiff's third point, the court noted that "Plaintiff was offered the opportunity to return to Young 4 in July of 1997." As such, Horwitz presented evidence sufficient to establish that the transfer "would have occurred regardless of the protected activity." Id. Accordingly, as to Horwitz, the court did not err when it found that "a jury could not find that there was discrimination against Plaintiff in her removal and reassignment."

B.
However, it cannot be "said that there is no evidence to support a jury verdict" as to Plaintiff's HWPA claims against Rivera. Ho, 88 Hawai`i at 256, 965 P.2d at 798. Rivera was required to report and investigate allegations of suspected patient neglect, and hospital policy called for "immediate action" to be taken to "remove the alleged perpetrators from the unit or area." See supra. However, viewed with the other evidence in the record, Plaintiff's allegations of retaliation by Rivera take on more weight.
As discussed, Plaintiff provided evidence of the following, which occurred in January of 1997, shortly after Plaintiff reported those caught sleeping to Rivera: (1) Rivera called Plaintiff in for various meetings of a disciplinary nature; (2) as to the report filed against Plaintiff and Granger, Rivera only issued a letter of counseling to Plaintiff, despite recommendations by Miyamura and Nakaji that both Granger and Plaintiff receive letters; (3) Rivera called a meeting with Plaintiff and accused her of cooking in the ward and "of not putting out an intake and output sheet," which Plaintiff maintains, "was not her assignment"; (4) Rivera requested that Castro and Rodriguez file reports on Plaintiff's alleged neglect; (5) Rivera told Plaintiff to fill out the incident report with the erroneous December 29th date, despite Plaintiff's explanations that it had occurred earlier; (6) Plaintiff was required to obtain permission from Rivera to go to her locker, or to visit her uncle who was located in Young 4; and (7) Rivera did not disclose that Patient's medical chart for December 30, 1996 lacked any indication of Patient's distress in her report, or bring it to the attention of Nakaji, Horwitz, or Miyamura during the investigations of Plaintiff's alleged neglect.
Giving Plaintiff's "evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence" in Plaintiff's favor, Ho, 88 Hawai`i at 256, 965 P.2d at 798, there was evidence to support a jury finding that Rivera's actions may have been in retaliation for Plaintiff's statements. Viewing the evidence as a whole in the light most favorable to Plaintiff, the jury reasonably may have concluded that Plaintiff's reporting of those sleeping may have been a "substantial or motivating factor" in Rivera's adverse actions against Plaintiff.[23] Accordingly, the directed verdict should not have been granted as to the HWPA claims against Rivera and the DOH. The court's directed verdict as to such claims, then, is vacated and the said claims are remanded for further proceedings.

VI.
Plaintiff contends that the court erred in dismissing her civil conspiracy claim. Other than this assertion, Plaintiff does not provide any arguments as to why the court erred. Plaintiff, however, references her arguments contained in her May 4, 1999 memorandum in opposition to Defendants' motion for directed verdict.
The DOH argues that there is insufficient evidence for a jury to find that there was an agreement among Defendants to commit § 1983 or HWPA violations, that Defendants committed overt acts in furtherance of the conspiracy, and that Plaintiff suffered damages as a result of the overt acts. We do not consider these arguments.[24]
In any event, the court explained that it granted the motion for directed verdict "as to Plaintiff's claim for civil conspiracy in light of the dismissal of both underlying claims." A plaintiff must allege an actionable underlying claim upon which to base a claim of conspiracy. See Ellis v. Crockett, 51 Haw. 45, 57, 451 P.2d 814, 823 (1969). Inasmuch as Plaintiff's HWPA claims have been remanded, Plaintiff's civil conspiracy claim based on the underlying HWPA claims must also be remanded.

VII.
Additionally, Plaintiff argues: (1) the court erred in awarding attorney's fees to Defendants as to Plaintiff's § 1983 claims[25] against Horwitz and Rivera in their official capacities inasmuch as (a) the purported offer to reinstate Plaintiff did not warrant the dismissal of her § 1983 claims; (b) the amount of attorney's fees was not apportioned properly; and (2) the court erred in granting Defendants their costs.

A.
As to her first point, Plaintiff relies on Christianburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978), for the proposition that a "district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." According to the Supreme Court, a plaintiff should not be assessed attorney's fees unless the court finds the claim was groundless at the outset or "that the Plaintiff continued to litigate after it clearly became so." Id. at 422.
This court reviews the court's denial and granting of attorney's fees under the abuse of discretion standard. TSA Int'l Ltd., v. Shimizu Corp., 92 Hawai`i 243, 253, 990 P.2d 713, 723 (1999). The court abuses its discretion if it bases its decision "on an erroneous view of law or on a clearly erroneous assessment of the evidence." Id. An "abuse of discretion occurs where the trial court has clearly exceeded bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party." Id.
In awarding attorney's fees, the court apparently found that Plaintiff was not reasonable in proceeding with the § 1983 damages claims against the aforementioned parties in their official capacities. The court, in its order filed September 22, 1999, awarded attorney's fees
incurred in the defense of Defendants [DOH], State of Hawai`i, and [Horwitz] in his official capacity and [Rivera] in her official capacity against Plaintiff's [§ 1983] claim during the period between July 11, 1997, the date of Defendants' counsel's first letter to Plaintiff's counsel, and March 2, 1998, the date of filing of the Order Granting . . . Partial Summary Judgment On Plaintiff's Damages Claim against Defendants State of Hawai`i, [Rivera], and [Horwitz], filed October 10, 1997.
(Emphases added.) In all other respects, the motion was denied. As such, the September 22, 1999 order did not provide attorney's fees for defending against Plaintiff's § 1983 claims for injunctive or declaratory relief.[26]
It is not apparent why the July 11, 1997 letter,[27] as mentioned in the court's order, is relevant for measuring the attorney's fees as to Plaintiff's § 1983 damages claims. The letter would appear relevant, if at all, to Plaintiff's official capacity § 1983 claims for injunctive and declaratory relief,[28] and Plaintiff's § 1983 claims against Defendants in their individual capacities, which survived summary judgment. Accordingly, on remand, the point from which the measure of an award of fees should begin must be determined.

B.
Next, Plaintiff argues Defendants "failed to apportion their fees according to the progress of this action."[29] According to Plaintiff, the court erred because Defendants did not apportion the work performed for the § 1983 "official capacity" damages claims from the other claims, as to which attorney's fees were not awarded.
In response, Defendants do not deny that they did not apportion fees.[30] Rather, they maintain (1) that they "requested that the trial court award fees based on a percentage of the attorney's overall fees" but "the trial court instead awarded those fees incurred during a limited window of time[,]" and (2) that the alleged HWPA and § 1983 violations were premised on the same theory of retaliation, apparently to suggest that apportionment is not necessary.[31]
Inasmuch as the September 22, 1999 order only provided for attorney's fees as to the § 1983 official capacity claims for damages, the court's March 30, 2000 final judgment and the September 22, 1999 and December 20, 1999 orders[32] are vacated with respect to the award of attorney's fees, and the matter is remanded with instructions to the court to limit the award, if any, to those fees incurred in the defense of the § 1983 damages claims as raised against the DOH, State of Hawai`i, Horwitz and Rivera, in their official capacities, consistent with the opinion herein.

C.
On March 30, 2000, the court filed its order granting Defendants' bill of costs in the amount of $14,386.04. "Because there is a presumption that the prevailing party may be awarded its costs, the burden of showing that a particular cost request is unreasonable is more properly on the adverse party." Wong v. Takeuchi, 88 Hawai`i 46, 53, 961 P.2d 611, 618 (1988). Plaintiff provides no argument as to why such an award was unreasonable. As such, Plaintiff has not made a sufficient showing that the court erred in its assessment of costs, and hence, the award of costs is affirmed.

VIII.
In her next point on appeal, Plaintiff argues the court erred (1) in granting Defendants' motion to exclude Plaintiff's exhibits relating to the television (TV) news stories of Plaintiff's criticism of the DOH and of the sleeping incident at Leahi Hospital[33] and (2) in excluding Plaintiff's letters to State officials,[34] "in [the] absence of good cause shown for [her] failure to produce said documents prior to discovery cutoff."
As to the newscasts, Plaintiff asserts that these exhibits evidence Defendants' motivation to punish her for criticizing the DOH and for "whistleblowing" about those caught sleeping. Plaintiff makes no argument regarding the court's conclusion that even if the aforementioned evidence was relevant, "its probative value [was] outweighed by the danger of prejudice," and thus, we do not consider this contention.[35]
As to the letters, Plaintiff (1) maintains that they were disclosed to Defendants on February 24, 1999, only five days after the discovery cut-off of February 19, 1999; (2) posits that the parties had agreed to extend the discovery cut-off from February 19, 1999 to February 24, 1999; (3) argues that the late disclosure was not deliberate or contumacious; and (4) asserts Defendants had not established that they suffered actual prejudice.
Although Plaintiff contends that the parties agreed to an extension for the discovery cutoff, Plaintiff provides no record citation for this assertion.[36] See HRAP Rule 28(b)(7) (appellant's opening brief shall contain the argument, "containing the points presented . . . with citations to the parts of the record relied on); Citicorp Mortgage, Inc., 16 P.3d at 838, 94 Hawai`i at 433 (declining to review a point on appeal where appellant failed to cite to the record or otherwise provide specific evidence to back up their claims).
The two cases provided by Plaintiff are inapposite to the issue at hand, for they do not address the issue of whether a court has abused its discretion in excluding evidence.[37] In this regard, Plaintiff has provided no discernable argument regarding the court's exclusion of the aforementioned evidence, and we decline to address such issues on appeal. Id. ("An appellate court does not have to address matters for which the appellant has failed to present a discernable argument."); see HRAP Rule 28(b)(7). In any event, Plaintiff was required to comply with discovery deadlines and apparently failed to do so. See Glover v. Grace Pac. Corp., 86 Hawai`i 154, 164, 948 P.2d 575, 585 (App. 1997) (finding that it was within the court's discretion to strike an expert as a witness for "failure to furnish his final opinion before the discovery cutoff date").

IX.
In their cross-appeal, Cross-Appellants first argue that the court erred when it denied their motion for directed verdict as to Plaintiff's defamation[38] and punitive damages claims, in the June 30, 1999 Order.

A.
Initially, Cross-Appellants maintain that their statements were not proven false by a preponderance of the evidence[39] because Plaintiff admitted that she did not care for Patient, and the erroneous date of neglect, namely December 29th instead of December 23rd, was "not a sufficient falsehood to render the statements defamatory under the substantial truth doctrine."[40]
The "issue of substantial truth is ordinarily a matter for the jury to decide." Kohn v. West Hawai`i Today, Inc., 65 Haw. 584, 591, 656 P.2d 74, 84 (1982). It is evident from the testimony and evidence that there were facts in dispute in addition to the date of the alleged neglect. See supra. Aside from Plaintiff's admission that she missed Patient on her first round on December 23, 1996, the circumstances surrounding whether Cross-Appellants falsely reported the extent of Plaintiff's neglect and the extent of Patient's condition were also contested.[41] Where proof of a "fact depends on oral evidence, a trial court is ordinarily not justified in directing a verdict in favor of the party bearing the burden of proof." Feliciano v. City & County of Honolulu, 62 Haw. 88, 93, 611 P.2d 989, 993 (1980). As such, the question of the truth or falsity of such facts was properly submitted to the jury. See Kohn, 65 Haw. at 590-91, 656 P.2d at 84 (explaining that whether a matter is true or false should be determined by a jury).
Viewing the "evidence and the inferences therefrom . . . in the light most favorable to the non-moving party," O'Neal, 87 Hawai`i at 186, 953 P.2d at 564, it cannot "be said that there [was] no evidence to support a jury verdict" in Plaintiff's favor. Ho, 88 Hawai`i at 256, 965 P.2d at 798 (citations and brackets omitted); see Feliciano, 62 Haw. at 93, 611 P.2d at 993 (explaining that a directed verdict may be granted if "the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn"). Thus, the court did not err in denying Cross-Appellants' motion for a directed verdict in that regard.[42]

B.
In the alternative, Cross-Appellants argue that their reports were privileged,[43] and that proof of a privilege is a defense to defamation. Qualified privileges are based on public policy and the need to protect a publication made in good faith where there is a special interest or duty. Russell v. Am. Guild of Variety Artists, 53 Haw. 456, 460, 497 P.2d 40, 44 (1972); see Lauer v. Y.M.C.A, 57 Haw. 390, 396, 557 P.2d 1334, 1338 (1976) (explaining that a qualified privilege "arises when the author of the defamatory statement reasonably acts in discharge of some public or private duty, legal, moral, or social, and the recipients of the publication [have] a corresponding interest or duty"). However, a qualified privilege is conditional and is lost by "[(1)] excessive publication, [(2)] use of the occasion for an improper purpose, or [(3)] lack of belief or grounds for belief in the truth of what is said." Calleon v. Miyagi, 76 Hawai`i 310, 319, 876 P.2d 1278, 1287 (1994); see Kainz v. Lussier, 4 Haw. App. 400, 405, 667 P.2d 797, 802 (1983).
This court has held that "the court must first decide the threshold question whether the qualified privilege exists[,]" and if a privilege exists, the court must then "submit the abuse of privilege issue to the jury issue to the jury for determination." Calleon, 76 Hawai`i at 319, 876 P.2d at 1287. The injured party must "demonstrate by clear and convincing[[44]] proof that [the defendants] were stirred by malice and not by an otherwise proper purpose." Towse v. State, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982). In rejecting the constitutionally based "actual malice" test, this court found the "`reasonable [person]' test" applicable. Id. at 632-33, 647 P.2d at 702-03. Under this test, a "defendant is required to act as a reasonable [person] under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information." Id. at 632-33, 647 P.2d at 703.
The court found that a qualified privilege did exist.[45] In denying the motion for a directed verdict as to Rodriguez, Rivera, and Castro, the court found "that there [was] sufficient evidence to create questions of fact as to whether Defendants Rodriguez, Rivera, and Castro abused and thus forfeited their qualified privilege and/or immunity to make the allegedly defamatory statements."
Cross-Appellants argue that once the court established that a qualified privilege existed, it should "only submit the issue to a jury where there is a dispute regarding (a) the content of the publication or (b) the circumstances in which the publication was made." (Citing McCartney v. Oblates of St. Francis DeSales, 609 N.E.2d 216, 223 (Ohio 1992).) But, as discussed, Plaintiff's evidence revealed significant discrepancies between Cross-Appellants' reports regarding Patient's condition on the night in question, as compared to the reports of other nurses on duty at the same time.
Such evidence sufficiently raised a dispute as to both the content of the publication, as well as the circumstances in which Cross-Appellants made such reports, and support Plaintiff's assertion that Cross-Appellants' reports were false. Hence, the court properly submitted the issue to the jury. A "reasonable [person] under the circumstances" would not submit a report stating that Patient was found shivering, moaning, and soaking in urine, if he or she did not find the patient in that state. Towse, 64 Haw. at 632-33, 647 P.2d at 703. If taken as true,[46] testimony from other nurses would make it "highly probable," or provide the jury with "a firm belief," Masaki v. Gen. Motors Corp., 71 Haw. 1, 16, 780 P.2d 566, 574 (1989), that Patient was not found in a state of distress on the morning in question. Such evidence would suffice as "clear and convincing evidence" that the reports were false. Towse, 64 Haw. at 630, 632-33, 647 P.2d 696, 701-03. Therefore, the court did not err in denying the motion for directed verdict as to Plaintiff's defamation claims.

X.
Furthermore, Cross-Appellants maintain that the court erred in refusing to grant the JNOV motion as to punitive damages.[47] In this regard, Cross-Appellants argue that (1) there was insufficient evidence to find that their statements were false and that Cross-Appellants acted with actual malice; (2) there was not clear and convincing evidence of malice to support an award of punitive damages; and thus, (3) the court erred in denying remittitur or new trial.

A.
As to their first point, Cross-Appellants argue that the court "erred in denying the [JNOV] for the same reasons that [it] erred in denying the [directed verdict motion.]" Both sides provided evidence that conflicted as to the defamation claims, much of which was testimonial. See supra. The facts surrounding whether Cross-Appellants falsely reported the extent of Plaintiff's neglect and the extent of Patient's condition were contested at trial. "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." Tsugawa v. Reinartz, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). This court would not be able to vacate the order regarding the JNOV without "weighing the credibility of the evidence." Calleon, 76 Hawai`i at 323, 876 P.2d at 1291. It is the role of the jury, and not the appellate court, to determine the credibility of witnesses and the weight of the evidence. See Tachibana v. State, 79 Hawai`i 226, 239, 900 P.2d 1293, 1307 (1995) (explaining that "an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence"); Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 117, 839 P.2d 10, 28 (1992).
The evidence must be viewed in the light most favorable to Plaintiff. See id.; O'Neal, 87 Hawai`i at 186, 953 P.2d at 564. On the basis of this record, it cannot be concluded that there "can be but one reasonable conclusion as to the proper judgment" regarding the defamation claims. O'Neal, 87 Hawai`i at 186, 953 P.2d at 564. Accordingly, Cross-Appellants have failed to demonstrate that the court erred in denying their motion for a JNOV as to the defamation claims.

B.
Cross-Appellants, in their next point, assert that there was insufficient evidence of malice to support an award of punitive damages.[48] This court has established that, for all punitive damage claims, the plaintiff
must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to the consequences.
Masaki, 71 Haw. at 16-17, 780 P.2d at 575.
As previously mentioned, Plaintiff provided evidence during the trial, consisting of her testimony, as well as the testimony of other nurses, inter alia, to support her assertion that Cross-Appellants falsely reported the facts[49] surrounding the allegations of neglect. See supra. After hearing all of the evidence, the jury apparently agreed that Cross-Appellants falsely reported the events at issue. See supra. Evidence that Cross-Appellants reported events that did not occur could sufficiently produce "a firm belief or conviction" in the mind of the jurors that Cross-Appellants acted "with such malice as implies a spirit of mischief." Masaki, 71 Haw. at 16-17, 780 P.2d at 575.
The jury could have believed that Cross-Apellants, in making false statements, engaged in "wilful misconduct . . . which would raise the presumption of a conscious indifference to [the] consequences" such false statements would have upon Plaintiff. Id. Thus, there was sufficient evidence of malice, under the clear and convincing standard. Id. Accordingly, the court did not err in denying Cross-Appellants' motion for JNOV as to the award of punitive damages.

C.
Next, Cross-Appellants argue that punitive damages of $25,000 each were "grossly disproportionate to the degree of malice, oppression or gross negligence, if any, that was shown by the evidence presented at trial." They conclude, consequently, that the court should have granted a new trial or a remittitur.[50] Cross-Appellants reason that (1) they "were legally required to make their reports" and even if some of their statements were false, the assessment of punitive damages is "not commensurate with the degree of malice, oppression or gross negligence proven at trial"; (2) Plaintiff did not present any evidence regarding Cross-Appellants' financial condition, and punitive damages in an amount close to their annual salaries was excessive; and (3) they have already been sufficiently punished by the fear and worry related to being named in the lawsuit.
First, as explained in the preceeding section, there was ample evidence to the effect that Cross-Appellants falsely reported facts and acted "with such malice as implies a spirit of mischief." Masaki, 71 Haw. at 16-17, 780 P.2d at 575. The jury could have reasonably determined that a $25,000 punitive damages award was warranted, given the evidence that Cross-Appellants falsely reported Plaintiff for neglect and/or sleeping on the job, and that such reports appeared to be retaliatory in nature. The fact that Cross-Appellants had a duty to report negligence does not warrant a reduction in damages, for inherent in that duty is the responsibility to be truthful, and to not falsify such reports.
Additionally, Plaintiff's failure to show Cross-Appellants' net worth "does not necessarily invalidate a punitive damages award but only eliminates a factor in which to gauge the reasonableness of the award." Ditto v. McCurdy, 86 Hawai`i 93, 106, 947 P.2d 961, 974 (1997) (quoting Romero v. Hariri, 80 Hawai`i 450, 458, 911 P.2d 85, 93 (1996).[51] Although "there is no bright-line rule to determine whether a punitive damages award is excessive[,]" id., this court has said that the proper measurement of punitive damages should be "the degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant[,] Kang v. Harrington, 59 Haw. 652, 664, 587 P.2d 285, 293 (1978) (quoting Howell v. Associated Hotels, 40 Haw. 492, 501 (1954).
In determining, on appellate review, "whether the damages awarded by the jury were excessive," we examine whether the award was "palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages, acted against rules of law or suffered their passions or prejudices to mislead them." Id.; Ditto, 86 Hawai`i at 106, 947 P.2d at 974. Furthermore, "an award is excessive if it shocks the conscience of the appellate court." Id. Finally, the amount of punitive damages is a matter which is peculiarly within the province of the jury[,]" Silva v. Bisbee, 2 Haw. App. 188, 192, 628 P.2d 214, 217 (1981), and such an award "will not be disturbed lightly[,]" Howell, 40 Haw. at 6. Cross-Appellants' false statements affected Plaintiff's reputation, caused her humiliation, and resulted in her removal from her department for several months. This case did not involve reports of negligence that were merely inaccurate or mistaken, but Cross-Appellants were accused of reporting the event falsely, or facts that did not occur.
The discrepancies between Cross-Appellants' reports and the contrary evidence presented, sufficiently establish malice or deceit. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (stating that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct" and looking at, inter alia, whether the harm was the result of intentional malice, trickery, deceit). Under these circumstances, it cannot be concluded that the punitive damages award "shock[s] the conscience." Ditto, 86 Hawai`i at 106, 947 P.2d at 974. Thus, the court did not err in denying a new trial or a remittitur.

XI.
Therefore, the March 30, 2000 final judgment is vacated as to (1) Plaintiff's HWPA claim against Rivera, (2) Plaintiff's civil conspiracy claims related thereto, and (3) attorney's fees, on the grounds set forth herein, and those matters are remanded to the court for further proceedings. In all other respects, the court's March 30, 2000 final judgment is affirmed.
CONCURRING OPINION BY LEVINSON, J.
I concur in the result.
DISSENTING OPINION BY MOON, C.J.
I respectfully dissent.
NOTES
[1] Cross-Appellants Castro and Rodriguez were employed by the Hospital as Paramedical Assistants (PMAs).
[2] Plaintiff filed her initial complaint on April 22, 1997. On December 18, 1997, Plaintiff filed her first amended complaint, asserting the same claims, while adding factual allegations. On September 15, 1998, Plaintiff filed her second amended complaint.
[3] The Honorable Kevin S.C. Chang presided over the motion for summary judgment and the Honorable Eden E. Hifo presided over the trial.
[4] Plaintiff does not appeal the directed verdict insofar as it relates to defamation.
[5] Cross-Appellants filed a motion for JNOV on July 9, 1999, as to punitive damages, but the court denied the motion.
[6] The award of attorney's fee was based on the fees incurred after Defendants' offer to reinstate Plaintiff in July 1997, until the motion for summary judgement was granted on March 2, 1998, dismissing Plaintiff's § 1983 claims against DOH, State of Hawai`i, and Horwitz and Rivera, in their official capacities.

The court awarded Defendants' request for costs with respect to the HWPA, free speech, and conspiracy claims, as well as Plaintiff's defamation claims against Arista, Castillo, Rivera, and Stone.
[7] This court has noted that Hawai`i Rules of Civil Procedure (HRCP) Rule 50 was amended, and no longer refers to motions for directed verdict or JNOV. See Nelson v. University of Hawai`i, 97 Hawai`i 376, 393 n.14, 38 P.3d 95, 112 n.14, (2001). The rule now "refers to motions for `judgment as a matter of law,' and motions made after trial are referred to as `renewed motions for judgment as a matter of law.'" Id. "[T]he change in terminology in the 1993 amendment to HRCP Rule 50 was not intended to result in a substantive change to existing Hawai`i law." Id. In the present case, the parties and the court used the terms "directed verdict" and "JNOV," accordingly, we use those terms herein.
[8] Julie Noji (Noji), the personnel manager of the Hospital, testified that Horwitz recommended termination without pay for one of the sleepers, and 30 days suspension without pay for the other four. Due to a grievance filed by the employees' union, all such suspensions and the termination recommendations were rescinded. Noji testified that she believed the recision was a result of "some technical and procedural flaws in the investigation of the incident."
[9] No record citation has been provided for this assertion.
[10] Plaintiff testified that Granger was calling in sick. During the conversation, they discussed, among other things, a patient who needed to have a nastrogastic tube changed, but did not discuss any personal matters.
[11] The statement asserted, inter alia, that "since [Plaintiff blew] the whistle about sleeping on the job, she should be included in the investigation with the people who were already investigated."
[12] The June 17, 1996 memorandum stated that

[Plaintiff's] knowledge of residents not being fed over a period of a month and not reporting it at the time makes her guilty of not reporting . . . . I am not saying that [Plaintiff] isn't knowledgeable about this. To the contrary, I think that she is very knowledgeable, but to cover herself she is shifting the blame to us for not having adequate mechanisms in place. No matter what we say, we may still come out not looking very adequate.
[13] As examples, Plaintiff recalls that: (1) on Thursday, September 26, 1996, Rivera wrote Plaintiff a memo requesting a meeting for Friday, September 27, 1996; (2) on Monday, September 30, 1998, Rivera prepared a second memo pointing out that a report from Plaintiff was due but not submitted on Saturday, September 28, 1996; and (3) Rivera stated that Plaintiff had until Tuesday, October 1, 1996, to submit her report, and failure to do so would be considered "insubordination."
[14] Castro testified that she did not prepare the report regarding Plaintiff's alleged neglect, until Rivera asked her to on January 24, 1997, because at the time of the incident, she did not think it was patient neglect. In her report, Castro recalled that she found Patient at 8:30 a.m. the morning of December 30, 1996, moaning, shivering, moving her arms, breathing loudly, and that she believed Patient was having a stroke. Castro reported to the Hospital investigators that Patient's gown, her two incontinent pads and her bottom sheet were all soaking wet with urine, and that the top sheet was wet all the way up to Patient's armpits, dripping on the floor, brown in color, and emitted a very strong odor. The "patient care record" for December 30, 1996, however, reflects that Castro checked on Patient, indicated on the chart that Patient was sleeping, and in "satisfactory" condition, and made no reference that Patient was in distress. Plaintiff notes that Castro was on vacation leave on December 24, 1996.

Rodriguez prepared a report stating that she observed, on December 30, 1996, one diaper on the table, which suggested that Patient had not been changed during the night. Plaintiff testified that Rodriguez did not work on December 23, 1996. Plaintiff also points out the scheduling charge for December 30, 1996 reflects that Rodriguez was not working on December 30, 1996. Rodriguez' schedule ended at 1:00 p.m. on December 29, 1996, and she was not scheduled to return until December 31, 1996 at 10:00 p.m. Thus Plaintiff maintains that "Rodriguez had no direct knowledge of the alleged neglect of [Patient] on December 30, 1996."
Myrna Matsuki (Matsuki), the charge nurse of Young 4, testified that she did not receive any report from Castro relating to Patient for that day. Vicky Bacayan testified that she checked on Patient three to four times between 4:00 a.m. and 6:00 a.m., and that she did not notice Patient in distress or smelling of urine. Teresa Cadiente, also on duty the morning of December 30 1996, testified that she administered medicine to Patient between 7:15 and 8:30 a.m., and that she did not notice anything unusual with Patient. Matsuki testified that she fed Patient on December 30, 1996, between 7:30 and 8:00 a.m., and that she did not recall anything unusual about Patient, nor the smell of urine. Moreover, Plaintiff notes that Nelia Dumalag, who followed after Castro's shift, also made no reference in Patient's "patient care record" that Patient was in any distress.
[15] Although Plaintiff does not provide a record citation for this point, Defendants do not rebut this statement. Instead, Defendants reply that Plaintiff failed "to demonstrate how Defendant Horwitz' response would have been different had the allegedly omitted information been reviewed."
[16] In addition to apparently overseeing Hale Malamalama, the Medical Facilities Branch has oversight responsibilities of Leahi Hospital.
[17] Asato and Yuen, although having reviewed Patient's medical chart, did not indicate that there were no notations of distress on the date in question. Yuen also testified that, despite having reviewed the exculpatory statements of Cadiente and Matsuki, they made no mention of such statements in their report.
[18] Noji testified that the "just cause" review was not required under applicable procedures, but that it was an optional measure, and she conducted the review pursuant to Horwitz's request, after Asato and Yuen submitted their report to Horwitz in February of 1997.
[19] Defendants do not contest that Plaintiff was transferred to the Young 3 ward.
[20] Plaintiff has not presented a discernable argument as to how her allegations of Defendants' failure to follow hospital procedure should factor into the court's First Amendment analysis, or how the court erred in light of such allegations. Accordingly, we decline to address this point on appeal. Citicorp Mortgage, Inc. v. Bartolome, 94 Hawai`i 422, 433, 16 P.3d 827, 838 (2000) ("An appellate court does not have to address matters for which the appellant has failed to present a discernable argument."); see Hawai`i Rules of Appellate Procedure (HRAP) Rule 28(b)(7).
[21] Plaintiff's counsel acknowledged that the balancing test was required by Crosby and was a matter of law to be decided by the court.
[22] Exhibit 10, entitled "Plan of Correction for Survey Conducted December 11, 1996 through December 13, 1996," following the incident involving those caught sleeping, was in response to the "Statement of Deficiencies and Plan of Correction" report of the federal Department of Health and Human Services Health Care Financing Administration (HCFA). See infra, below. The plan set out measures to ensure that residents were protected from neglect in the future, and called for "the immediate removal of the alleged perpetrator from the area of the alleged victim(s) whenever an allegation of abuse, neglect, or mistreatment is lodged against that person[,]" as required by "Policy #102-11-3, procedures 1-17 and F223 §483.13(b)(c)." (Emphasis added.)

Exhibit 14 is a memo regarding the policy and procedures manual update pertaining to patient abuse reporting and investigating, which states, inter alia, that during an investigation of abuse or a suspicion of abuses the Hospital "shall take whatever action is necessary to prevent further potential abuse."
Exhibit 53 is a memo from Plaintiff to Rivera, entitled "Additional Comments to ERF of 1/27/97 Regarding Alleged Nursing Care Problem on Young 4, Room 406C on 12/29/96," in which Plaintiff admits that she missed Patient on her first round, but upon discovering her mistake, "immediately gave nursing care" to Patient twice in the second round.
Exhibit 54 is Plaintiff's ERF incident report form, filed January 27, 1997, in which Plaintiff admits she missed Patient and "turned the wrong resident" on her first round, on the night of December 29, 1996. The report states that "she believed she went and gave [Patient] nursing care" on the second round although "1½ to 2 hours late" and thus corrected it the "best [she] could."
Exhibit 90 is the HCFA "Statement of Deficiencies and Plan of Correction" report. It states that the Hospital did not follow the "Leahi Hospital Resident Policies  Freedom From Abuse and Retaliation Section IV  Procedure A-1, 4th point," which required "`immediate action, such as removing the alleged perpetrator from the area, to protect the resident. . . .'"
[23] As noted, the jury found Cross-Appellants liable for defamation, which means it believed that they reported false information regarding Plaintiff.
[24] The DOH did not cite any statutes or authority in support of this argument, nor did it include any citations in the record indicating whether such arguments were raised or addressed by the court below, as required by HRAP Rules 28(c) and 28(b)(7) (2003). See HRAP Rule 28(c) (instructing that the answering brief "shall be of like character as that required for an opening brief); see also HRAP Rule 28(b)(7) (instructing appellants to provide "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied upon"); Citicorp Mortgage, Inc., 94 Hawai`i at 433, 16 P.3d at 838 (declining to review a point on appeal where appellants failed to cite to the record or otherwise provide specific evidence to back up their claims). As a result these arguments will not be considered.
[25] 42 U.S.C. § 1988 permits recovery of attorney's fees in a § 1983 action, and provides, in relevant part, that in "any action or proceeding to enforce a provision of [§§] 1981, 1983, 1985 and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
[26] Defendants' motion for partial summary judgment, filed October 10, 1997, only pertained to Plaintiff's damages claims, and stated that "the instant motion does not seek to have this [c]ourt adjudicate any of [Plaintiff's] request[s] for declaratory and injunctive relief." The court's March 2, 1998 order was entitled "Order Granting . . . [Defendants'] Motion for Partial Summary Judgment on [Plaintiff's] Damages Claim Against Defendants . . . ." (Emphasis added.)
[27] Defendants' proposal for Plaintiff's reinstatement, as reflected in the July 11, 1997 letter, is arguably relevant in the context of attorney's fees surrounding Plaintiff's § 1983 official capacity claims for injunctive relief, for returning to Young 4 was the injunctive remedy she was seeking. Thus Defendants may have had grounds for attorney's fees if Plaintiff proceeded with her injunctive claims after an offer to be reinstated. However, Plaintiff's official capacity § 1983 claims for injunctive and declaratory relief were not dismissed in the March 2, 1998 order granting summary judgment, and are not at issue in the award of attorney's fees.
[28] Plaintiff notes that her original and amended complaints sought both declaratory and injunctive relief against Horwitz and Rivera in their official capacities. Plaintiff asserts that in Pele Defense Fund v. Paty, this court adopted the rule in Ex Parte Young, 209 U.S. 123 (1908), which, in recognizing an exception to Eleventh Amendment immunity, allowed state officials to be sued in their official capacities for prospective injunctive relief. 73 Haw. 578, 609-10, 837 P.2d 1247, 1266 (1993). As discussed, the court's March 2, 1998 order granting partial summary judgment only applied to Plaintiff's § 1983 official capacity claims for damages, and thus, the award of attorney's fees did not apply to Plaintiff's § 1983 claims for declaratory or injunctive relief. Accordingly, we do not address the parties' arguments as to the award of attorney's fees regarding Plaintiff's § 1983 claims for declaratory on injunctive relief.
[29] Plaintiff notes that the affidavit in support of Defendants' recovery of attorney's fees included a summary of the total hours and fees charged by each member of Mr. Robbins' firm, for a proposed award of $109,344.00. Mr. Robbins represented the DOH, Horwitz, Rivera, Arista, Castillo, Stone, and Yuen.
[30] Cross-Appellants do not respond to Plaintiff's argument that the amount of attorney's fees was not apportioned properly.
[31] DOH did not provide any statutes or authority in support of this argument, nor did it include any citations in the record indicating whether such arguments were raised or addressed by the court below, and thus we do not address these arguments on appeal. See HRAP Rule 28(c) (instructing that the answering brief "shall be of like character as that required for an opening brief); see also HRAP Rule 28(b)(7) (instructing appellants to provide "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied upon"); Citicorp Mortgage, Inc., 94 Hawai`i at 433, 16 P.3d at 838 (declining to review a point on appeal where appellants failed to cite to the record or otherwise provide specific evidence to back up their claims).
[32] The September 22, 1999 order granted the award of attorney's fees, and required Defendants "to submit an affidavit and certification in support of the award of attorney's fees in Defendants' favor." After Defendants submitted said affidavit and certification, the court, on December 20, 1999, entered its "Order Setting Amount of Attorney's Fees Regarding Defendants' . . . Motion for Attorney's Fees, Filed July 14, 1999." In its December 20, 1999 order, the court awarded Defendants attorney's fees in the amount of $109,344.00.
[33] The DOH notes that the news stories featuring Plaintiff criticizing the DOH pertained to an incident at the Hale Malamala, did not involve Leahi Hospital, and were not in any way connected with the activities or reputations of Defendants Horwitz and Rivera. As to the TV news stories regarding the sleeping incident at Leahi Hospital, the DOH contends that Plaintiff "is not featured in this news story, and there [was] no evidence that [Plaintiff was] responsible for or otherwise connected with this news story." Accordingly, the DOH posits that such evidence was irrelevant and immaterial. Alternatively, Defendants assert that if at all relevant, the probative value of the news stories would be substantially outweighed by the danger of unfair prejudice and confusion, and would constitute a waste of time and a needless presentation.
[34] Plaintiff maintains that the letters related to her ongoing criticism of the DOH, of which Defendants had notice.
[35] When an appellant raises a point of error but fails to present any accompanying argument, the point is deemed waived. Weinberg v. Mauch, 78 Hawai`i 40, 48, 890 P.2d 277, 285 (1995); Assoc. of Apartment Owners of Elua v. Wailea Resort Co., Ltd., 100 Hawai`i 97, 107, 58 P.3d 608, 619 (2002); HRAP Rule 28(b)(7) (instructing appellants to provide "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, stautes, and parts of the record relied upon").
[36] Defendants argue that the parties agreed to extend the discovery cut-off to February 24, 1999, for the sole purpose of conducting additional depositions. [DOH] Neither party provides a citation for these assertions.
[37] Berkos v. Nat'l Broad. Co., Inc., 515 N.E.2d 668 (Ill. App. Ct. 1987) involved a claim that the broadcast itself constituted libel, inter alia, and the admission of the broadcast as evidence was not an issue at trial. Shasteen, Inc. v. Hilton Hawaiian Village Joint Venture, 79 Hawai`i 103, 109, 899 P.2d 386, 392 (1995), involved whether it was error to dismiss a case with prejudice involving the deliberate delay to prosecute a case diligently, inter alia, and did not involve discovery abuses, nor establish a standard for the exclusion of evidence.
[38] To sustain a claim for defamation, a plaintiff must establish: (1) "a false and defamatory statement concerning another"; (2) "an unprivileged publication to a third party"; (3) "fault amounting at least to negligence on the part of the publisher"; and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Dunlea v. Dappen, 83 Hawai`i 28, 36, 924 P.2d 196, 204 (1996), abrogated on other grounds in Hac v. Univ. of Hawai`i, 102 Hawai`i 92, 106-07, 73 P.3d 46, 60-61 (2003).
[39] Arguing that there was no false statement, Cross-Appellants also contend that the court should not have considered whether there was a question of fact as to whether Cross-Appellants forfeited their qualified privilege. Inasmuch as we find that there was sufficient evidence to create questions of fact as to the falsity of Cross-Appellants's reports, we need not address this point. See infra.
[40] Cross-Appellants posit that under the substantial truth doctrine, "the defendant cannot be found liable for defamation even if she [or he] `cannot justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true; irrespective of slight inaccuracy in details.' Masson v. New Yorker Magazine, 501 U.S. 496, 516-17 (1991)."
[41] As mentioned other nurses on duty at the time Patient was allegedly found in distress testified that they did not notice anything unusual during that time, and Plaintiff testified she did not miss any patients on December 29, 1996. See supra.
[42] In its June 30, 1999 Order, the court did not expressly address the issue of the "substantial truth" of Cross-Appellants' statements. However, inasmuch as we decide that there was sufficient evidence to raise questions of fact surrounding Cross-Appellants' statements, the court did not err in denying the motion for a directed verdict as to this issue, even if on other grounds.
[43] Cross-Appellants state that a qualified privilege applied to their statements because they filed their reports pursuant to the Hospital policies, and HRS §§ 346-222 (1993) and 346-224 (1993) impose a legal duty to report all suspected incidents of patient abuse and neglect to the Department of Human Services.
[44] This court has defined "clear and convincing" evidence as "an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of the fact to be highly probable." Masaki v. Gen. Motors Corp., 71 Haw. 1, 16, 780 P.2d 566, 574 (1989).
[45] Cross-Appellants and Plaintiff do not contest the court's conclusion that a qualified privilege existed.
[46] "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence[.]" Tachibana v. State, 79 Hawai`i 226, 239, 900 P.2d 1293, 1307 (1995) (quoting Domingo v. State, 76 Hawai`i 237, 242, 873 P.2d 775, 789 (1995)); Amfac, Inc. V. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 117, 839 P.2d 10, 28 (1992) .
[47] The court's March 30, 2000 order does not provide the court's rationale for denying Defendants' motion for JNOV, but it indicates that the court had "stated the basis for its ruling," implying that its rationale was provided during the hearings. However, Cross-Appellants do not provide any citations to the record indicating the court's rationale, or how it erred in denying the JNOV motion, other than one reference to the court's reasoning in denying the motion for directed verdict.
[48] Cross-Appellants maintain that the court erred by equating "`actual malice' that could rebut the good faith presumption of the qualified privilege, with `malice' for the purposes of punitive damages." Inasmuch as we conclude that there was sufficient evidence to support the jury's finding of punitive damages under a clear and convincing standard, see infra, the court did not err in affirming the award of punitive damages, even assuming, arguendo, it did not apply the clear and convincing standard of proof for affirming the jury's verdict.

As mentioned, the court's March 30, 2000 order does not provide the court's rationale for denying Defendants' motion for JNOV, and Cross-Appellants do not provide any citations to the record indicating the court's rationale in ruling on the JNOV. In support of their assertion that the court did not apply the "clear and convincing standard," Cross-Appellants point to the court's ruling on the motion for directed verdict, in which the court found a question of fact existed as to whether the qualified privilege had been abused. The court stated
that which the plaintiff could prove by a preponderance of the evidence, that would be a forfeiture of the qualified immunity under defamation[,] might also be proven by clear and convincing evidence to the jury, and if it were, than that could constitute a basis, although phrased differently under various case law[,] for punitive damages and, therefore, denies the motion [for directed verdict] as to punitive damages as to defendants Rodriguez, Rivera, and Castro on defamation.
It is not evident from this language that the court did not apply the clear and convincing standard.
[49] Although Cross-Appellants had a legal duty to report what they believed to be neglect, they provide no case or statute to support their argument that this duty should preclude punitive damages if they falsely report events that did not occur. Accordingly we do not address this point on appeal. See Weinberg, 78 Hawai`i at 48, 890 P.2d at 285 (explaining that when an appellant raises a point of error but fails to present any accompanying argument, the point is deemed waived); Assoc. of Apartment Owners of Elua, 100 Hawai`i at 107, 58 P.3d at 619; HRAP Rule 28(b)(7) (instructing appellants to provide "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied upon").
[50] "Generally, in an appeal from a jury trial, if the appellate court decides that the amount of damages is too high, it can give the plaintiff a choice of either filing a remittitur of the excessive portion of the damages or consent to a new trial." Kang v. Harrington, 59 Haw. 652, 664, 587 P.2d 285, 293 (1978).
[51] Moreover, "it is in the defendant's best interest to put on evidence of financial condition when punitive damages are being considered because `the defendant . . . always has it in his [or her] power to present the real facts to the jury in answer to the general proof of the plaintiff." Ditto, 86 Hawai`i at 106, 947 P.2d at 974 (quoting Romero, 80 Hawai`i at 458, 911 P.2d at 93) (emphasis added).